887 A.2d 1170 (2005)
382 N.J. Super. 145
Nagiba EL-SIOUFI, R.N. and Arlene Simpson, R.N., Plaintiffs-Appellants,
v.
ST. PETER'S UNIVERSITY HOSPITAL and Jacqueline Carey, R.N., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 2004.
Decided December 29, 2005.
*1175 Michael R. Speck, Iselin, argued the cause for appellants (Richmond & Burns, attorneys; Mr. Speck, on the brief).
John C. Petrella argued the cause for respondents (Genova, Burns & Vernoia, attorneys; Mr. Petrella, of counsel; Celia S. Bosco and Laura H. Corvo, on the brief).
Before Judges A.A. RODRÍGUEZ,[1] WEISSBARD and HOENS.
The opinion of the court was delivered by
HOENS, J.A.D.
Plaintiffs Nagiba El-Sioufi, R.N., and Arlene Simpson, R.N., appeal from the January 10, 2003 order and the January 17, 2003 order, respectively, of the Law Division granting summary judgment in favor of defendants St. Peter's University Hospital (the Hospital) and Jacqueline Carey, R.N., and dismissing their employment discrimination complaint. We affirm the order of January 10, 2003 dismissing the claims raised by El-Sioufi and we dismiss as abandoned the appeal from the January 17, 2003 order filed by Simpson.[2]
*1176 We have derived the following summary of the relevant facts from our review of the voluminous appendix of materials supplied by plaintiff[3] in support of and by defendants in opposition to the issues raised in the appeal.[4] Plaintiff first began to work at the Hospital, through the auspices of a temporary employment agency, as an Operating Room (OR) nurse in May 1997. A month later, defendant Carey, who was the Manager of the OR and the Post-Anesthesia Care Unit (PACU), hired plaintiff to work directly for the Hospital as an OR staff nurse. Carey was plaintiff's direct supervisor and prepared plaintiff's performance evaluations. Those early evaluations, in October 1997 and December 1998, indicated that plaintiff's nursing performance exceeded the standards for her position.
Beginning in January 1999, however, Carey received written and oral complaints from OR staff members and physicians about plaintiff's performance. Carey, as plaintiff's supervisor, kept the written complaints she received about plaintiff in a file and she began to record her own notes about plaintiff's performance, which she maintained in that file as well.
The written complaints were both many and varied. For example, in January 1999 the PACU charge nurse advised Carey that plaintiff's failure to alert PACU personnel about the special needs of a patient being brought from the OR resulted in a significant delay in obtaining equipment required for that patient's care. In February 1999, the evening charge nurse sent Carey a memo listing several occasions on which plaintiff had failed to correctly perform the instrument count in the OR. This led to an incident in which an abdominal incision could not be closed in a timely manner because plaintiff's count could not be verified. The same memo reported about other occasions when plaintiff failed to have the correct equipment available for the surgeon.
In March 1999, another staff member wrote to Carey, referring to several prior verbal complaints, and contending that plaintiff was disorganized in the OR. She advised Carey of a situation during which plaintiff's count could not be verified, as a *1177 result of which the surgeon ordered a patient to undergo an X-ray to ensure that no surgical tools or other materials had been left inside the patient. That staff member ended her written complaint by claiming that plaintiff was compromising patient safety and by advising Carey that she did not want to be assigned to the same OR as plaintiff, a request she had previously verbalized to Carey.
In addition, according to Carey, from December 1998 through February 1999, she received verbal complaints about plaintiff from five different surgeons. They described plaintiff as disorganized, inaccurate, argumentative and unfamiliar with procedures and equipment. Two of them specifically requested that plaintiff not be assigned to work with them in the future.
In March 1999, Carey and Beverly Johnson, R.N., who was the Perioperative Instructor at the Hospital, began to have regular meetings with plaintiff in response to these complaints. They told plaintiff that they were receiving complaints from other staff and from physicians about her performance. According to Carey, she and Johnson conducted these meetings in an effort to assist plaintiff in correcting her deficiencies. Carey asserts that they hoped to give plaintiff a chance to improve before her next formal evaluation, then scheduled for June 1999. Carey and Johnson met with plaintiff several times and asked her to work with Johnson. According to Carey, plaintiff simply refused to meet with Johnson for instruction and insisted that "she did not have any performance deficiencies."
On May 26, 1999, Carey and Johnson met with plaintiff, advised her of the continuing complaints and told her about the staff members and surgeons who refused to work with her. They also told her that because she would not meet with Johnson for further education and because she had not addressed the issues relating to compromised patient care, her assignment would be changed. Plaintiff was then reassigned to work as a break nurse and a laser operator. She was again asked to see Johnson for further instruction. Following that meeting, plaintiff still refused to meet with Johnson for educational assistance. Carey continued to receive written and oral complaints about plaintiff's performance and its effect on patient safety. The June 1999 evaluation described plaintiff's performance as "below standard."
In June 1999, plaintiff requested that she be permitted to take Friday, July 2, as a vacation day. Her charge nurse denied the request because vacation days were based on seniority and because others more senior than plaintiff had already been given that day. Soon after, plaintiff approached Carey with her request. Carey told plaintiff that because of the July 4th holiday, the weekend patient census and OR coverage issues, she could not guarantee that plaintiff could have the day off, but told plaintiff to find someone to cover her shift. On July 1st, plaintiff again approached Carey. Carey checked the staff schedule and patient census, and again told plaintiff to arrange for a replacement.
After Carey and the charge nurse, Joseph Abraham, checked the schedule again that evening, Abraham called plaintiff and informed her she could not have the next day off and that she needed to come in. In response, plaintiff, who had apparently not arranged for anyone to cover for her, called Carey at home. Plaintiff told Carey that she could not work on July 2 because of a family emergency. She conceded, however, that in actuality the emergency was a family wedding she wanted to attend. Carey told plaintiff that she still could not have the day off and that she was expected to be at work. Plaintiff did *1178 not report to work as directed, but instead, called out absent. Carey wrote up plaintiff for a one-day suspension for insubordination and gave her a written warning for excessive absenteeism because plaintiff had then been absent five times in six months. The suspension was never formalized, however, and never became part of plaintiff's formal personnel file. Instead, according to Carey, she put it in her own file because plaintiff apologized and asked if Carey would reconsider suspending her.
Carey continued to receive verbal and written complaints about plaintiff's performance. The complaints were related to both plaintiff's work with the laser equipment and her ability to take over for others in the OR when she was assigned to cover their breaks. By early October, both Carey and Johnson had received additional complaints from other OR staff members, including one who decided to forego a lunch break rather than leave the OR in plaintiff's care because of plaintiff's inability to maintain an accurate instrument count in her absence.
On October 15, 1999, Carey reminded plaintiff that her next evaluation would be taking place in a few months and again told her that she needed to meet with Johnson for assistance in addressing the deficiencies in her performance. Carey told plaintiff that if she would not meet with Johnson, they would consider placing her on a Performance Improvement Plan, also referred to as a Work Plan. The record reflects that if an OR employee is placed on a Work Plan, the employee is monitored by an OR instructor for ninety days. The employee is also required to meet for ongoing assessment of his or her performance and is subject to termination if the identified deficiencies are not improved by the end of the Work Plan period.
In late October 1999, plaintiff met with Jeff Williams, an employee in the Hospital's Human Resources Department. Plaintiff told Williams that Carey had threatened her with an unfavorable evaluation because she had refused to work on the upcoming Christmas holiday. On November 5, 1999, plaintiff sent a letter to Sheryl Slonim, Vice President of Patient Care Services for the Hospital, in which she confirmed her verbal complaint to Williams. According to that letter, plaintiff believed that Carey had subjected her to a "string of harassments regarding personal days, vacations and time off" and that her work assignment was switched from scrub nurse or circulating nurse to break nurse as a part of that harassment.
In particular, plaintiff alleged that Carey had "strong prejudices against people of different faiths and ethnic backgrounds." She based this conclusion on the fact that in June 1996, when she had first been interviewed for a job at the Hospital, she was told that she was hired but the job did not thereafter become hers and she was unemployed for a year. Arlene Simpson later told plaintiff that the offer was rescinded because Carey "changed her mind ... and ... would not hire a Muslim who wears a scarf on her head." Plaintiff's letter also stated her belief that, by being asked to work on Christmas and Easter, which are not holidays she observes, she was being discriminated against because of her religion. The letter accused Carey of lying about the complaints she had received and objected to any implementation of a Work Plan.
In response to that letter, the Hospital began an internal investigation. While that process was underway, OR personnel continued to complain to Carey that plaintiff's performance was deficient. During that time period, Carey received a complaint that plaintiff left a surgical specimen *1179 in the Recovery Room where the patient and family members could see it in violation of Hospital procedures. In November 1999, Johnson and Carey met with plaintiff and explained to her that her 1999 evaluation was "below standard."
Because of the continuing complaints about plaintiff's performance and because some of the complaints raised concerns about patient and staff safety, Beverly Johnson and Ellen Shuzman, who was the Hospital's Director of Education and Development, began to meet with plaintiff late in November. They identified the complaints that had been made and offered to assist plaintiff with additional education and training. They also told plaintiff that because of the nature of the complaints, Johnson would observe her and would evaluate her performance. When Johnson did so in December 1999, she identified several deficiencies in plaintiff's performance, including her inability to properly document instrument counts and follow verbal orders from physicians.
Early in February 2000, Carey received a memorandum from Johnson which advised her that plaintiff had placed surgical drapes into a hamper and that a scalpel handle and blade were found in those drapes by a technician. Johnson further advised that when she asked plaintiff about that incident, plaintiff told her that she had been in a rush. This incident was significant to Johnson and Carey because it posed a serious threat to the safety of hospital personnel and raised additional concerns about patient welfare. Johnson noted that the incident raised questions about plaintiff's familiarity with procedures relating to instrument counts which was particularly troubling because these procedures had been reviewed with all OR personnel during the previous week.
Because of continuing evidence of plaintiff's performance deficiencies and her failure to make progress, in February 2000, plaintiff was required to comply with a Work Plan. As part of that process, she attended regular meetings relating to her performance. According to hospital records, each meeting included a review of specific instances in which plaintiff's performance was inadequate and a discussion of any instances in which plaintiff demonstrated improvement. The Work Plan required plaintiff to be monitored by the OR instructor for ninety days for an assessment of her performance.
In April 2000, the Hospital sent plaintiff a letter signed by Slonim and by David Lister, the Vice President of Human Resources. That letter advised plaintiff that the investigation into her November 1999 complaint of religious discrimination was complete. The letter also advised her that the Hospital had concluded there was no evidence of religious discrimination by Carey. However, plaintiff was asked specifically to immediately report any future acts which she believed were discriminatory. The letter closed by noting that plaintiff's supervisors had identified performance deficiencies, which were then being addressed through the Education Department and the Work Plan.
In July 2000, plaintiff completed the Work Plan. Nevertheless, Carey continued to receive complaints about plaintiff's performance from OR staff and others. These complaints included instances in which plaintiff misused or was unfamiliar with equipment, failed to maintain legible documents, failed to record equipment or supply counts and miscounted surgical sponges, scalpels and similar equipment. In addition, on May 11, 2001, Carey received a complaint that resulted in a written warning to plaintiff based on her failure to properly connect EKG leads to a patient during surgery. Plaintiff's error led to inaccurate EKG readings during *1180 that surgical procedure. The written warning advised plaintiff that further incidents would result in discipline.
On May 18, 2001, one of the surgeons reported that plaintiff was responsible for a lost biopsy specimen. Plaintiff had been the circulating nurse during a biopsy procedure the physician had performed. As such, she was responsible for labeling, documenting and sending specimens from the biopsy to the pathology lab. When the specimen container arrived at the pathology lab, however, it was empty. An investigation into the incident revealed that plaintiff had not confirmed the specimens. When plaintiff was asked to provide a statement relating to the missing specimen, she refused. The Hospital concluded that the missing biopsy specimen was a serious infraction and that in light of plaintiff's lengthy history of poor performance, termination was appropriate. Plaintiff was terminated on June 1, 2001.
Plaintiff's four count complaint asserted that defendants "failed to properly treat Plaintiffs[5] in the performance of their duties," retaliated against plaintiff for her complaint against Carey in violation of the LAD, "failed to follow the LAD," and "conspired to create an environment of hostility towards Plaintiffs and to create false records concerning the standard of care provided by Plaintiffs." In addressing these contentions in the context of defendants' motions for summary judgment, the motion judge, correctly, redefined them to be assertions of religious discrimination in violation of LAD, N.J.S.A. 10:5-1 to -42, retaliatory discharge, and hostile work environment.[6] The motion judge granted defendants' motions for summary judgment, concluding that plaintiff could not establish the elements of the prima facie case for purposes of her religious discrimination claim, that she had failed to produce any evidence to demonstrate a causal connection between her protected activity and her termination sufficient to support her retaliation claim, and that plaintiff had failed to produce any evidence tending to demonstrate that defendants had created a hostile work environment.
On appeal, plaintiff asserts that the motion judge misapplied the law, misunderstood the facts and inappropriately relied on inadmissible hearsay offered by defendants. Although we do not entirely agree with the analysis utilized by the motion judge, our independent review of the record compels us to affirm the result she reached.

I.
We first address plaintiff's evidentiary contention. She asserts that the motion judge improperly considered certain of the evidence submitted by defendants in support of their summary judgment motion. More specifically, she argues that it was inappropriate for the judge "to consider certain material facts supplied by defendants because they are premised on hearsay and not personal knowledge and would not be admissible at trial." In particular, plaintiff points to Carey's sworn certification and her submission of information from the file of complaints about plaintiff that she maintained as being inadmissible hearsay.
*1181 We have commented on numerous occasions that summary judgment motions must be supported by relevant and admissible evidence. See, e.g., Claypotch v. Heller, Inc., 360 N.J.Super. 472, 489, 823 A.2d 844 (App.Div.2003); Jeter v. Stevenson, 284 N.J.Super. 229, 233-34, 664 A.2d 952 (App.Div.1995); Sellers v. Schonfeld, 270 N.J.Super. 424, 428, 637 A.2d 529 (App.Div.1993). Nothing in those decisions, however, supports the conclusion that plaintiff would have us reach here.
Plaintiff's attack, in short, is based on her contention that the judge should not have relied at all on the certification offered by Carey about the complaints that she had received because Carey lacked first-hand knowledge that any of those complaints were in fact true. She concedes that Carey maintained a file of memoranda she had written documenting verbal complaints and summarizing her meetings with plaintiff and that Carey's file also included letters from others specifying the incidents about which they were complaining. Plaintiff refers to this as a "secret file" and asserts that in her independent discussions with some of those from whom Carey had received complaints, these individuals had not verified to plaintiff that they had made any complaints. Because she therefore disputes the truth of the assertions in the complaints themselves, she argues that the motion judge should have rejected Carey's statements as inadmissible hearsay. We disagree.
Statements that might otherwise be hearsay may be admissible if they are not offered to prove the truth of the matter asserted. See N.J.R.E. 801(c); State v. Long, 173 N.J. 138, 152, 801 A.2d 221 (2002). Indeed, "where statements are offered not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof, the statements are not inadmissible hearsay." Spragg v. Shore Care, 293 N.J.Super. 33, 56, 679 A.2d 685 (App.Div.1996) (citation omitted); see also Jugan v. Pollen, 253 N.J.Super. 123, 136, 601 A.2d 235 (App. Div.1992).
Here, the statements relied upon by defendants were relevant to show that there was a reasonable factual basis for reassigning plaintiff in May 1999, for instituting a Performance Improvement Plan in February 2000 and ultimately for terminating her employment with the Hospital in June 2001. The issue is not whether the factual events described in the staff and physician statements were true, but whether Carey and the Hospital, to whom the complaints were made, acted reasonably in light of that information. In the context of plaintiff's claims that she was the victim of religious discrimination, that she was subjected to a hostile work environment and that her termination was in retaliation for her November 5, 1999 complaint letter, the information in Carey's file bears on the reasonableness and good faith of defendants' conduct. See Spragg, supra, 293 N.J.Super. at 57, 679 A.2d 685.
Nor do we agree with plaintiff's assertion that the statements were any less reliable for this purpose by virtue of the fact that Carey maintained them in her office file. Although plaintiff refers to Carey's file as a "secret file," which she suggests is in some manner unreliable, there is no basis in the record for that assertion. The file to which plaintiff refers, and on which Carey and the Hospital relied, is part of plaintiff's personnel record. Indeed, it is particularly appropriate that employers or individual supervisors maintain such files, in which they keep records of negative or critical comments about employees from other employees or supervisors.
*1182 Such records are especially relevant in the context of employment discrimination claims. As the federal courts have noted: "`[a]n employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than devious.'" Watkins v. Nabisco Biscuit Co., 224 F.Supp.2d 852, 863 (D.N.J.2002)(quoting Fuentes v. Perskie, 32 F.3d 759, 766 (3d Cir.1994)). It is entirely reasonable, and not unusual, for an employer to maintain such files. It is equally appropriate for a supervisor to maintain a file documenting an employee's performance and to include in that file copies of complaints raised by others about that employee. We reject, therefore, plaintiff's evidentiary argument as lacking any merit.

II.
Before turning to the specific substantive arguments plaintiff has raised on appeal, we begin with a brief recitation of the relevant published decisions that bear on all of plaintiff's statutory claims of discrimination.
Our Supreme Court has adopted the three-step burden-shifting analysis first developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed.2d 668 (1973), as the method for analyzing LAD claims. See Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 382, 541 A.2d 682 (1988); Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 82, 389 A.2d 465 (1978). The McDonnell Douglas or burden-shifting model requires the following three part analysis:
(1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
[Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432, 442, 541 A.2d 1046 (1988)(citing Peper, supra, 77 N.J. at 82-83, 389 A.2d 465; McDonnell Douglas, supra, 411 U.S. at 807, 93 S.Ct. at 1826, 36 L.Ed.2d at 680).]
Utilizing this analysis, the court first determines whether plaintiff has produced sufficient evidence to demonstrate the elements of his or her prima facie case. If so, then the burden shifts to the employer to produce evidence of "legitimate, non-discriminatory reasons" that support its employment actions. See Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 462, 744 A.2d 1186 (2000); Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209-10, 723 A.2d 944 (1999). Once the employer has done so, the burden shifts back to plaintiff to prove that the stated reasons were a pretext for discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 517, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407, 422-23 (1993). With this methodology in mind, we turn to plaintiff's specific claims and the evidence.

III.
Plaintiff's first claim is that she was the victim of religious discrimination. The elements comprising the traditional formulation of the prima facie case for discrimination are that: (1) plaintiff belongs to a protected class; (2) she was performing her job at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions.[7]See Maher v. New Jersey Transit *1183 R.O. Inc., 125 N.J. 455, 480-81, 593 A.2d 750 (1991); Jansen, supra, 110 N.J. at 382, 541 A.2d 682.
Here, the motion judge concluded that because of the numerous, serious complaints about plaintiff's job performance, she could not demonstrate part two of the prima facie case, that is, that her performance met the employer's legitimate or reasonable expectations. See Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). Following the decision on defendants' summary judgment motions, however, our Supreme Court rejected, in part, this traditional articulation of the prima facie test. See Zive v. Stanley Roberts, Inc., 182 N.J. 436, 867 A.2d 1133 (2005).
Of particular relevance to the issues presented in this appeal, the Court concluded that a plaintiff need no longer prove that he or she was meeting the employer's "legitimate" or "reasonable" expectations as a part of establishing the elements of his or her prima facie case. Instead, the Court held, with respect to this part of the prima facie case: "[a]ll that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination." Id. at 454, 867 A.2d 1133. The Court described this aspect of the prima facie test as imposing a burden that is "rather modest." Id. at 447, 867 A.2d 1133. Although this rearticulation of the relevant test requires us to consider plaintiff's proofs in that light, we find no basis on which to reach a different conclusion than the one reached by the motion judge.
Indeed, while one might legitimately question whether an employee, like plaintiff, whose job performance is so substandard that the employee is already included in a program designed to provide education and training needed for minimal competence can carry even this modest burden, we need not directly answer that question here. Nor need we presume that the outcome of the motion would have been any different had plaintiff been given the benefit of the Zive analysis. Although the Court in Zive made it plain that the evidentiary burden at the prima facie stage of the analysis is "modest," id. at 447, 867 A.2d 1133, or even "slight," id. at 448, 867 A.2d 1133, the evidence of poor performance is relevant in the summary judgment analysis nonetheless.
Any evidence relating to plaintiff's job performance, post-Zive, becomes a part of the proofs to be considered in evaluating the other parts of the traditional McDonnell Douglas test. Thus, as the Court recognized in Zive itself, issues concerning job performance are relevant to the proffered legitimate business reason for the adverse employment action and to the pretext analysis. Id. at 456-57, 867 A.2d 1133. Moreover, as the Court noted, the effect of the decision in Zive is not to require that every plaintiff be afforded a jury trial. Rather, the focus of the inquiry, presuming that the employer offers a legitimate, non-discriminatory reason for the adverse employment action, moves to *1184 the pretext analysis. Id. at 455, 867 A.2d 1133. In that regard, as the Court reminded us:
[I]f the employer proffers a non-discriminatory reason, plaintiff does not qualify for a jury trial unless he or she can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." That is a significant enough burden to relieve any practical concerns over the rule we have limned today. If it is clear that that obligation cannot be met, defendants will prevail at summary judgment.
[Id. at 455-56, 867 A.2d 1133 (quoting Fuentes, supra, 32 F.3d at 764).]
We note, as well, that we review orders and not, strictly speaking, reasons that support them. We have held, in other contexts, that a correct result, even if predicated on an erroneous basis in fact or in law, will not be overturned on appeal. See, e.g., Govito v. West Jersey Health System, Inc., 332 N.J.Super. 293, 321, 753 A.2d 716 (App.Div.2000)(holding that judge's erroneous legal reasoning nonetheless produced the correct result); Gerber v. Springfield Bd. of Educ., 328 N.J.Super. 24, 40, 744 A.2d 670 (App.Div.2000)(affirming summary judgment in spite of erroneous reasoning of motion judge); GNOC, Corp. v. Dir., Div. of Taxation, 328 N.J.Super. 467, 474, 746 A.2d 466 (App.Div.2000)(holding that an order will be affirmed when correct even if the reasons given by the trial judge were incorrect), aff'd, 167 N.J. 62, 768 A.2d 1051 (2001). We therefore think it appropriate to review this record in light of the Zive Court's refinement of the summary judgment model. Based on our thorough review of the record on appeal, however, we conclude that even giving plaintiff the benefit of the reduced burden on the second part of the prima facie test for religious discrimination, the motions would have been granted.
Assuming, without deciding, that plaintiff's evidence as to her performance of the job prior to her termination is sufficient to demonstrate that she was "performing" the job, the appropriate analysis would then have required her to demonstrate, as a part of her prima facie case, that she suffered an adverse employment action and that it occurred in circumstances that give rise to an inference of religious discrimination. In this analysis, the only adverse employment action that plaintiff suffered was her termination. Although she asserts that her unfavorable job evaluations were the result of discrimination, we have held in a related context that an unfavorable evaluation, unaccompanied by a demotion or similar action, is insufficient. See, e.g., Keelan v. Bell Communications Research, 289 N.J.Super. 531, 538-39, 674 A.2d 603 (App.Div.1996)(discussing CEPA definition of adverse employment action); Casseus v. Elizabeth Gen. Med. Ctr., 287 N.J.Super. 396, 406, 671 A.2d 176 (App.Div.1996)(discussing relationship between Title VII definition of prohibited employment actions and LAD definition).[8]
Even if we were to conclude that a less drastic employment action, such as a *1185 job reassignment, see Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633, 652-53 (1998), might be sufficient to support the prima facie claim, there is no evidence that this reassignment was in any sense an adverse employment action. The LAD defines the prohibited action as an action as follows: "to refuse to hire or employ or to bar or to discharge or require to retire ... or to discriminate against ... in compensation or in terms, conditions, or privileges of employment." N.J.S.A. 10:5-12a. There is nothing in this record that demonstrates that the position to which plaintiff was reassigned, namely break nurse and laser operator, adversely affected plaintiff in any way that might arguably fall within the definition of a prohibited act.
Plaintiff's termination, of course, is an action that the statute recognizes as a prohibited adverse employment action if it was discriminatory, that is, in this context, if it was based on plaintiff's religion. Applying the Zive formulation of the prima facie case, plaintiff need not prove that the adverse employment action was based on her protected status. Instead, she must only point to circumstances that raise an inference that there is a connection between her protected status and the adverse employment action. Thereafter, the analysis, post-Zive, requires the court to presume discrimination and shift the burden to the employer to produce evidence of a legitimate non-discriminatory reason for the employment action. The record on appeal provides ample evidence of the reasons proffered by defendants for both the reassignment of plaintiff, were we to consider that sufficient for the prima facie case, and for plaintiff's termination. In its simplest terms, defendants proffered evidence of plaintiff's poor job performance as the legitimate non-discriminatory reason for both of these actions.
Pursuant to the McDonnell Douglas analysis, this evidence of a legitimate, non-discriminatory reason for each of the employment actions operates to shift the burden back to plaintiff to produce evidence that the reasons offered are merely a pretext for discrimination. Our review of the record reveals that plaintiff points to three pieces of evidence that she contends are proof that defendants discriminated against her because of her religion.[9]
First, she relies on the statement that her former co-plaintiff Simpson attributed to Carey in 1996, when plaintiff was not hired, to the effect that Carey did not want to hire a Muslim. Second, she asserts that the denial of her request for a vacation day in July 1999 for the purpose of attending a family wedding interfered with the practice of religion because the wedding itself was a religious event. Third, she argues that Carey expected that she would work on Christmas in 1999, which is a holiday she does not observe, but which is a day when she believes she would not have been asked to work were she not a Muslim. We reject the suggestion that any of these incidents supports a finding *1186 that defendants discriminated against plaintiff because of her religion.
First, even if Carey uttered the statement in 1996 that is attributed to her, the simple fact of the matter is that plaintiff was eventually hired. Indeed, plaintiff herself concedes that she confronted Carey about that alleged statement shortly after being hired and that Carey essentially apologized, asked plaintiff to please put it behind her and told her that she was looking forward to working together.[10] We decline to find that a single statement made prior to one's employment can support a subsequent discrimination complaint. We decline to find that a single statement, never repeated, and the subject of an apology, can be the basis for a pretext argument in response to employment actions that occurred years later.
Second, with regard to the wedding incident, the record abundantly demonstrates that plaintiff did not have enough seniority to have a vacation day on the Friday before the Fourth of July weekend and did not secure another nurse to cover her shift as she was permitted to do. Apart from those facts, we reject the assertion, implicit in this argument, that a wedding amounts to a religious observance deserving of special respect or deference from one's employer simply because it includes the participation of clergy or is otherwise sanctified.
Third, as to the employer's request that plaintiff work on Christmas, we note that this religious celebration is not one that plaintiff observes. We further note that when plaintiff objected to being asked to work on Christmas because she had worked on that holiday in the prior year, she was not required to do so. More to the point, however, there is no evidence in the record that plaintiff was denied time off to observe her own religious holidays and we reject the notion that asking her to work on Christmas, presumably so that others might be permitted to celebrate their religious holiday, in any way amounts to discrimination against her because of her Muslim faith.
The pretext part of the McDonnell Douglas analysis requires more of a plaintiff than simple identification of an act or event that the plaintiff believes bespeaks discrimination. As our Supreme Court has held, "[t]o prove pretext, however, a plaintiff must do more than simply show that the employer's [proffered legitimate, non-discriminatory] reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent." Viscik v. Fowler Equip. Co., 173 N.J. 1, 14, 800 A.2d 826 (2002)(citing Erickson v. Marsh & McLennan Co., 117 N.J. 539, 561, 569 A.2d 793 (1990)). We have described this burden on plaintiff as one in which the plaintiff:
must submit evidence that either casts sufficient doubt upon the employer's proffered legitimate reason so that a factfinder could reasonably conclude it was fabricated, or that allows the factfinder to infer that discrimination was more likely than not the motivating or determinative cause of the termination decision.
[Svarnas v. AT & T Communications, 326 N.J.Super. 59, 82, 740 A.2d 662 (App.Div.1999)(citing Fuentes, supra, 32 F.3d at 762).]
More recently, we have reiterated that in the summary judgment context, *1187 the analysis to be undertaken is two-fold, and that a plaintiff may discharge this burden either by producing circumstantial or direct evidence that discrimination was more likely than not a motivating or determinative cause of the action or by discrediting the reason offered by the employer as the legitimate and non-discriminatory one. See DeWees v. RCN Corp., 380 N.J.Super. 511, 527-29, 883 A.2d 387 (App.Div.2005)(citing Fuentes, supra, 32 F.3d at 764). Although the second of these methods may be accomplished by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons," see id. at 528, 883 A.2d 387 (quoting Fuentes, supra, 32 F.3d at 765), the requirement that plaintiff do so as an alternative is one that the motion judge may address in the context of the summary judgment motion. Plaintiff's burden on the pretext part of the analysis, using either approach, however, is not insignificant.
Our careful and searching review of this record and of the evidence and arguments plaintiff has raised to demonstrate pretext compels us to conclude that she has not sustained her burden under either of the Fuentes prongs. On the contrary, the evidence in the record is overwhelming that any and all actions taken against plaintiff by defendants were based on the legitimate, non-discriminatory reasons that they proffered.
Plaintiff's job reassignment was motivated by continuing complaints about deficiencies in her performance so serious that the safety and welfare of both patients and her co-workers were threatened. As for plaintiff's termination, there is simply no evidence that it was based on anything other than the incident that immediately preceded it in which plaintiff lost a biopsy specimen, which she was entrusted to securely package and send to the laboratory. As we have previously held:
[I]t should require no citation to state that an employee's poor performance in discharging his duties is a legitimate nondiscriminatory reason to fire or demote the employee.
[Casseus, supra, 287 N.J.Super. at 405, 671 A.2d 176 (citing Turner v. Crowley's Ridge Dev. Council, 919 F.2d 79, 80 (8th Cir.1990)(employee's inadequate performance of her managerial duties was a legitimate nondiscriminatory reason for discharge); Jamerson v. Board of Trustees of University of Alabama, 662 F.2d 320, 324 (5th Cir.1981)(employee whose fellow employees found him to be "extremely difficult to work with" was legitimately discharged)).]
Where, as here, the evidence "is so one-sided" that plaintiff cannot prevail, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), summary judgment is appropriate.

IV.
Plaintiff's complaint also asserted that she was terminated from her employment in retaliation for protected activity related to her religion. Our Supreme Court has identified the required elements of an LAD retaliation claim as follows:
To establish a prima facie case of discriminatory retaliation, plaintiffs must demonstrate that: (1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation.
[Craig v. Suburban Cablevision, 140 N.J. 623, 629-30, 660 A.2d 505 (1995)(citing Jamison v. Rockaway Township Bd. of Educ., 242 N.J.Super. 436, 445, 577 A.2d 177 (App.Div.1990); Wrighten v. *1188 Metropolitan Hosps., Inc., 726 F.2d 1346, 1354 (9th Cir.1984)).]
Federal precedents applying our LAD in similar circumstances have utilized the same elements for purposes of the prima facie case. See, e.g., Abramson v. William Paterson College, 260 F.3d 265 (3d Cir. 2001); Mancuso v. City of Atlantic City, 193 F.Supp.2d 789, 811 (D.N.J.2002).
The motion judge observed that the only evidence supplied by plaintiff in opposition to the motion for summary judgment and in support of her contention that she was the victim of discriminatory retaliation was her certification, which the judge described as "conclusory." Applying the test for the prima facie case to the evidence in the record, the motion judge concluded that plaintiff had failed to demonstrate that there was any link between plaintiff's claimed protected activities and any acts of retaliation.
On appeal, plaintiff points to four acts that she contends are retaliatory. She argues that the first two acts are directly linked to activity that she believes was protected and that the other two were part of a pattern of retribution for her decision to resist actions by Carey that she describes as antagonistic. Succinctly stated, she asserts that she filed a written complaint charging Carey with religious discrimination on November 5, 1999 and suffered retaliation four days later in the form of a less than favorable evaluation of her performance. She states that after her attorney telephoned counsel for defendants in February 2000 she was placed on a Work Plan in March 2000. She states that she was thereafter given a further unfavorable evaluation, which she asserts was in retaliation for her decision to continue to work at the Hospital. Finally, she contends that her termination itself was in further retaliation for her protected activities and what she describes as her refusal to be intimidated.
Our review of the record and our careful consideration of these arguments demonstrate that there is no ground on which to reach a conclusion contrary to that of the motion judge. First, we agree with the motion judge's apt description of plaintiff's allegations as conclusory.
Second, apart from the final act complained of, that is, her termination from employment, none of the acts complained of technically qualifies as retaliation in the sense of an adverse employment action. In the CEPA context, which we have relied upon for its analogous interpretation of the concept, we have held that, in order to be actionable, an allegedly retaliatory act must be "sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner." Cokus v. Bristol-Myers Squibb Co., 362 N.J.Super. 245, 246, 827 A.2d 1098 (App.Div.2003). In Cokus, we affirmed the Law Division judge's conclusion, inter alia, that a negative employment evaluation, unaccompanied by a tangible detriment, such as a salary reduction or job transfer, is insufficient to rise to the level of an adverse employment action. See Cokus v. Bristol-Myers Squibb Co., 362 N.J.Super. 366, 378, 827 A.2d 1173 (Law Div.2002), aff'd, 362 N.J.Super. 245, 827 A.2d 1098 (App.Div.2003). We note, as well, that in the record before us on appeal, there is no evidence that plaintiff's complaint about Carey was in any way related to her unfavorable evaluation. Indeed, there is no evidence that Carey or any one else involved in the evaluation was even aware of the complaint letter at that time. Similarly, plaintiff's assertion that her attorney contacted an attorney for the Hospital and that this caused the decision to place her on a Work Plan, presuming that to be an *1189 adverse employment action, is wholly unsupported in the record.
Third, even considering all of the events which plaintiff asserts constitute retaliation, there is no evidence in the record that supports the suggestion that there is any connection between the acts complained of and any protected activity on plaintiff's part. Although it is true that the November 1999 evaluation, which was less favorable than plaintiff's initial evaluations, followed her written complaint about Carey by four days, mere temporal synchrony alone is insufficient to sustain plaintiff's prima facie case. Instead, we are required to examine the allegations of retaliation in context rather than in isolation.
Viewed in that light, plaintiff's less than stellar evaluation followed months of complaints about her performance. Those complaints came from a wide variety of sources. Many of the complaints raised serious concerns about the safety of patients and others at the hospital. Those complaints had continued in spite of efforts on the part of Carey and others to assist plaintiff with additional training and education. Plaintiff's assertions that, because of her twenty-five years of experience in the profession and her early positive evaluations, she was not in need of training, that the complaints were unfounded, or that defendants were simply discriminating against her for her complaints about Carey, represents nothing more than her personal view of the events. The record, however, offers no support for that view and abundant support for the Hospital's decisions that assisting her with her education and retraining was appropriate.
Moreover, we decline the invitation, implicit in plaintiff's arguments, to find that filing a complaint about a supervisor completely insulates an employee from adverse employment actions thereafter. We decline to adopt her argument that mere temporal coincidence supports a cause of action where an objective view of the facts simply does not.
Finally, there is no evidence in this voluminous record to support plaintiff's assertion that her eventual termination was retaliatory. On the contrary, the record overwhelmingly supports the conclusion that plaintiff's termination was the direct result of her failure to properly preserve a biopsy specimen and the consequential loss of that unique material to the detriment of the patient then being treated. Plaintiff's argument that her termination was the culmination of a campaign of antagonism and that it is therefore actionable is baseless.

V.
Plaintiff's final claim is that she was subjected to a hostile work environment because of her religion. Once again, we begin with a review of the relevant principles that inform our analysis.
In any LAD-based hostile environment claim, the plaintiff must demonstrate that: (1) the conduct complained of was unwelcome; (2) that it occurred because of the plaintiff's inclusion in a protected class under the LAD; and (3) that a reasonable person in the same protected class would consider it sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive work environment. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 603-04, 626 A.2d 445 (1993). Our review of a hostile work environment claim requires us to consider the totality of the circumstances. See id. at 607, 626 A.2d 445; Mandel v. UBS/PaineWebber, Inc., 373 N.J.Super. 55, 73, 860 A.2d 945 (App. Div.2004).
In a hostile work environment claim based on religious discrimination, the inquiry is "whether a reasonable person of plaintiff's [religion or creed] would consider *1190 the alleged ... comments made by or in the presence of plaintiff's supervisors to be sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment." Heitzman v. Monmouth County, 321 N.J.Super. 133, 147, 728 A.2d 297 (App.Div.1999). Of course, a plaintiff must also show that the "`complained-of conduct ... would not have occurred but for [his or her] [religion].'" Abramson, supra, 260 F.3d at 277 (citing Hurley v. Atlantic City Police Dep't., 174 F.3d 95, 114 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000)(quoting Lehmann, supra, 132 N.J. at 587, 626 A.2d 445 (1993))). We evaluate severity and pervasiveness by considering the conduct itself rather than the effect of the conduct on any particular plaintiff. See Lehmann, supra, 132 N.J. at 606, 626 A.2d 445.
Although, because of the invidious nature of discrimination, it may be possible to infer an intent to discriminate, see Abramson, supra, 260 F.3d at 278, not every offensive remark, even if direct, is actionable. As we have held: "epithets or comments which are `merely offensive'" will not establish a hostile work environment claim. Heitzman, supra, 321 N.J.Super. at 147, 728 A.2d 297 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993)); see Herman v. Coastal Corp., 348 N.J.Super. 1, 22, 791 A.2d 238 (App.Div.), certif. denied, 174 N.J. 363, 807 A.2d 195 (2002). Instead, the "`[c]onduct must be extreme to amount to a change in the terms and conditions of employment.'" Heitzman, supra, 321 N.J.Super. at 147, 728 A.2d 297 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662, 677 (1998)). Thus,
"whether an environment is `hostile' or `abusive' can be determined only looking at all the circumstances,' which `may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance."
[Ibid. (quoting Harris, supra, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03).]
A single comment, if sufficiently severe, may be enough to create a hostile working environment. See Taylor, supra, 152 N.J. at 502-03, 706 A.2d 685; Flizack v. Good News Home for Women, 346 N.J.Super. 150, 159-60, 787 A.2d 228 (App.Div.2001); Leonard v. Metro. Life Ins. Co., 318 N.J.Super. 337, 345, 723 A.2d 1007 (App. Div.1999). The cases in which a single statement has sufficed for purposes of creating a triable question about hostile work environment, however, have uniformly involved an outrageous and offensive statement made by a supervisor directly to the complaining subordinate. No such evidence appears in this record.
Such a factual scenario is highly unusual. More frequently, as in Heitzman, supra, or Mandel, supra, a plaintiff seeks to demonstrate that an environment is hostile by relying on a variety of statements or behaviors directed to plaintiff and others. As the Third Circuit has held, a hostile work environment claim will survive summary judgment:
if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."
[Abramson, supra, 260 F.3d at 278-79 (quoting Harris, supra, 510 U.S. at 21, 114 S.Ct. 367).]
*1191 The motion judge granted defendants' summary judgment motions on this aspect of the complaint because plaintiff had failed to come forward with any fact that suggested that she was subjected to a hostile work environment as our case law has defined it. We have searched plaintiff's brief and the record on appeal in an effort to discern what facts she believes demonstrate that the work environment created by defendants was hostile in the sense required for relief. We have found none. We therefore find no ground on which to reach any conclusion other than the one reached by the motion judge.

VII.
The order of January 10, 2003 granting summary judgment in favor of defendants on the claims of plaintiff El-Sioufi is affirmed. The appeal of plaintiff Simpson from the order of January 17, 2003 granting summary judgment is dismissed.
NOTES
[1] Although assigned to this appeal, Judge Rodríguez was unable to be present during oral argument. However, counsel for both parties waived his presence at oral argument and consented to his participation in the decision.
[2] The original complaint in the Law Division named both El-Sioufi and Simpson as co-plaintiffs. The defendants' motion for summary judgment on Simpson's claims was considered separately from the motion directed to El-Sioufi's claims. The motion for summary judgment as to the counts in the complaint relating to Simpson was granted by an order dated January 17, 2003 for reasons that the motion judge expressed on the record on that date. Although the notice of appeal identified both El-Sioufi and Simpson as appellants and although that notice specifically appealed both the January 10, 2003 order relating to El-Sioufi and the January 17, 2003 order relating to Simpson, neither the brief filed on appeal nor the arguments presented referred in any way to the separate claims raised by Simpson. We therefore deem Simpson's appeal to have been abandoned and we dismiss it. See In re Certification of Need of Bloomingdale Convalescent Ctr., 233 N.J.Super. 46, 48 n. 1, 558 A.2d 19 (App.Div. 1989).
[3] In light of our decision to dismiss Simpson's appeal, we will refer throughout this opinion to El-Sioufi as plaintiff.
[4] We note that the brief filed on plaintiff's behalf failed to conform to the requirements of R. 2:6-2(a)(4) in that it did not present a "concise statement of the facts material to the issues on appeal supported by references to the appendix and transcript ... in the form of a narrative chronological summary...." Instead, the brief reproduced the response to the statement of material facts, see R. 4:46-2(a), -2(b), that plaintiff had filed in the Law Division and referred in general to the extensive record as well as to previously-filed briefs relating to the summary judgment motion. Although we have, in the past, refused to even consider briefs that are deficient in this fashion, see Dougherty v. N.J. State Parole Bd., 325 N.J.Super. 549, 553, 740 A.2d 150 (App.Div. 1999), we have elected to treat this matter with indulgence and to address the appeal on the merits notwithstanding this lack of compliance with the applicable rule. We note, however, that this failure on plaintiff's part has burdened us unnecessarily by requiring us to sift through the papers and transcripts included in the voluminous appendix and has deprived us of being able to rely on plaintiff's explanation of the facts. Nevertheless, we have done so with great care in an effort to ensure that we have correctly understood "the essential nature of the controversy." Miraph Enter. Inc. v. Bd. of Alcoholic Beverage Control, 150 N.J.Super. 504, 508, 376 A.2d 189 (App.Div.1977). However, we cannot avoid pointing out that this failure to comply with our rules has prevented us from being able to timely resolve this appeal and has greatly delayed our preparation of this decision.
[5] Because Simpson was a co-plaintiff, the allegations necessarily refer to plaintiffs in the plural. We review the complaint, however, only as it relates to plaintiff El-Sioufi.
[6] The motion judge commented on the record that it was conceded by all parties that the allegations that purported to sound in civil conspiracy were not substantiated and would be dismissed. Plaintiff does not challenge that aspect of the order on appeal, as a result of which we need not consider it.
[7] At least one decision of the United States Supreme Court describes this final element of the prima facie case to require that plaintiff produce "`evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . . .'" O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-13, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 439 (1996)(quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977)). Our Supreme Court has recently implied that evidence tending to support that inference may be required. See Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447, 867 A.2d 1133 (2005). In light of our disposition of the issues on appeal, we need not consider the sufficiency of plaintiff's proofs in this regard.
[8] We recognize, of course, that to some extent, the distinction is statutory. Both the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and Title VII include specific language that bears on the meaning of the prohibited acts. Nevertheless, we discern no ground on which to conclude that the meaning of the prohibited adverse employment actions within the LAD is significantly different.
[9] In actuality, our review of plaintiff's brief suggests that she also asserts that some or all of the complaints included in Carey's file are fictitious. She claims, in part, that Carey identified some of the individuals who complained about her and that when plaintiff confronted them, these same people told her that they "had no complaint about her" or "had no problem with her." To the extent that she intended to demonstrate that the information in Carey's file was false, however, she was obligated to do so in admissible form. See R. 4:46-5(a). Similarly, plaintiff suggests that Carey was engaged in a campaign to punish her for failing to inform Carey about the shortcomings of others. The record does not reflect in any way how, even if that were Carey's plan, it was related to or motivated by a plan to discriminate against plaintiff based on her religion.
[10] We recognize that a single statement, if sufficiently severe, can support a hostile work environment claim. See Taylor v. Metzger, 152 N.J. 490, 499, 706 A.2d 685 (1998). We address the implication of this statement in that context, infra.