**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

13-4711
_____

ROBERT HENSON,
Appellant

v.

U.S. FOODSERVICE, INC.; JOHN DOES 1-10
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 1-11-cv-01809)
District Judge:  Hon. Jerome B. Simandle
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 30, 2014

Before:  AMBRO, CHAGARES, and VANASKIE, Circuit Judges.

(Opinion Filed:  October 15, 2014)
_____

OPINION
_____

CHAGARES, Circuit Judge.

After being terminated from his employment, Robert Henson filed a lawsuit

against his former employer, U.S. Foodservice, Inc. ("U.S. Foods"), alleging violations of

the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and the New Jersey

Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5–1, et seq.  Henson now

appeals the District Court's grant of summary judgment in favor of U.S. Foods. For the reasons that follow, we will affirm the judgment of the District Court.

## II.

We write exclusively for the parties and therefore set forth only those facts that are necessary to our disposition. U.S. Foods distributes food, equipment, and related products to restaurants, hospitals, and other institutional customers. On or about April 4, 2004, Henson, who is African American, was hired to be a Selector at the Bridgeport, New Jersey warehouse for U.S. Foods. Selectors receive product orders, load products onto pallets, and bring pallets to the loading dock to be packaged for delivery to customers. Henson worked in this position until his termination.

Selectors at the Bridgeport facility are subject to U.S. Foods' Rules of Conduct ("the Rules"), a document negotiated by U.S. Foods and Local No. 169 of the Teamsters Union ("the Union"), which represents the Selectors. The Rules set forth a non-exhaustive list of the standards of conduct that apply to Selectors. Selectors may face "<u>Immediate Termination</u>" for certain violations of the Rules, including "Insubordination: including the failure to follow a direct order from a supervisor/manager." App. 199-200. A mere failure to follow instructions is not an offense that results in immediate termination under the Rules.[1]

---

[1] Selectors are also subject to various performance standards, and U.S. Foods evaluates Selectors based on "mispicks." A mispick occurs when a Selector fails to select or incorrectly selects a product for delivery to customers. When a Selector has mispicks in excess of a specified rate, he is subject to discipline. During Henson's employment over the course of six years, he repeatedly received discipline and counseling for mispicks. In 2008, he received disciplinary write-ups for mispicks on eight separate occasions; in

During his six years of employment, Henson requested and was granted leave under the FMLA on numerous occasions. He took continuous FMLA leave from August 28, 2006 through January 9, 2007 for a medical condition, after which he was reinstated. He also requested and took intermittent FMLA leave throughout 2009 and 2010, returning to work in the same position after each absence. U.S. Foods never prevented Henson from taking FMLA leave.

Henson alleges, however, that there existed "ongoing antagonism" at U.S. Foods regarding employees taking FMLA leave. Henson Br. 5. He points to the testimony of Darwin Moore, another U.S. Foods employee who was terminated and filed a lawsuit against U.S. Foods alleging FMLA and NJLAD violations. Moore testified that he heard Rob Lebb, Director of Operations, tell other employees that they were working more because of their "FMLA buddies" and encourage employees to call people who were on FMLA leave and tell them to return to work. Appendix ("App.") 349. Moore also testified that Lebb once said "these motherfuckers on FMLA [were] the reason [employees were] working . . . overtime." App. 350. In addition, Henson asserts that he once heard his direct supervisor, Jack Conway, refer to the FMLA as the "fraudulent medical leave act." App. 351.

Henson also alleges that Conway often made offensive comments while Henson and other African-American employees ate lunch together in the break room. During these lunches, Conway allegedly asked Henson and the others if they were eating chicken

2009, he received disciplinary write-ups for mispicks on nine separate occasions; and in 2010, he received one warning for mispicks.

3

and grape soda, joked about African-Americans' genital sizes and watching basketball, and referred to his own African-American stepchildren listening to rap music. Conway also called Henson's lunch break the "BET lunch," apparently referring to the "Black Entertainment Television" channel. According to Henson, all of Conway's comments occurred in the break room during the third lunch break. Selectors can choose between three different lunch breaks, and they are not required to eat in the break room.

On August 26, 2010, Henson was preparing a shipment that included one full pallet plus five additional boxes of frozen crab legs for a major U.S. Foods customer. He retrieved a full pallet of crab legs from the warehouse freezer and added five boxes to the top. The pallet contained approximately 25 boxes weighing 30 pounds each, for a total of 750 pounds stacked five feet high, and it was "leaning precariously because boxes on the bottom of the pallet had been crushed." U.S. Foods Br. 9.

When Conway saw the leaning pallet, he instructed Henson to rebuild it. Instead of following Conway's direction, Henson replaced the leaning pallet with a new, "better-looking" pallet without Conway's permission. App. 75. Henson then added five boxes to the new pallet, returned the leaning pallet to the freezer, and left work for the day. Henson asserts that he did not follow Conway's instruction because he "was just really trying to get home" and he thought his way was "better." App. 76. Henson admits that leaning pallets pose safety hazards.

The day after the incident, Henson met with Conway, Lebb, and his Union shop steward, William Anthony. Anthony testified that Henson "wasn't really remorseful in that meeting, no. Kept saying he indicated that he felt his way was better than the

4

company's way. He did not show no remorse in that meeting, no. He actually thought he was not doing nothing wrong." At the meeting, Henson was informed that he had been suspended pending the conclusion of an investigation into the incident.

On August 31, 2010, Henson was terminated by U.S. Foods. The stated reason for his termination was insubordination and lack of remorse. Henson grieved his termination through the Union. U.S. Foods denied his grievance, and the Union did not exercise its right to appeal the termination decision. During the grievance process, neither Henson nor the Union ever raised allegations of race or FMLA discrimination, although Henson's termination occurred during a designated FMLA period.

On March 30, 2011, Henson filed a complaint in the District Court for the District of New Jersey, alleging that he was retaliated against for using leave under the FMLA and discriminated against based on his race in violation of the NJLAD when U.S. Foods terminated his employment on August 31, 2010. He also claimed that he was subjected to a hostile work environment based on his race in violation of the NJLAD.

U.S. Foods filed a motion for summary judgment on March 14, 2013. The District Court granted the motion, holding that Henson failed to make out a prima facie case of race discrimination or FMLA retaliation and that U.S. Foods had a legitimate, non-discriminatory reason for terminating Henson's employment that a reasonable jury could not find was a pretext for discrimination or retaliation. The court also found that Henson was not subjected to a racially hostile work environment. Henson timely appealed.

III.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 1367(a), and we have appellate jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the District Court's grant of summary judgment, applying the same standard employed by the District Court. Curley v. Klem, 298 F.3d 271, 276 (3d Cir. 2002). That is, we "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In doing so, "we view all evidence in the light most favorable to the non-moving party." Kurns v. A.W. Chesterton Inc., 620 F.3d 392, 395 (3d Cir. 2010).

IV.

Henson argues that the District Court erred in granting summary judgment to U.S. Foods with respect to his FMLA retaliation and NJLAD hostile work environment claims. We will address each of his claims in turn.

A.

The FMLA grants certain employees the right to take up to 12 weeks off during a 12-month period "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). When an employee returns from FMLA leave, the employer must restore the employee to the same or equivalent position he held, with equivalent benefits and with conditions of employment comparable to those he had when he left. Id. § 2614(a). Federal regulations prohibit an employer from retaliating against an employee for taking advantage of FMLA leave. 29 C.F.R. § 825.220(c).

6

Courts generally look at FMLA retaliation claims "through the lens of employment discrimination law" because such claims require proof of the employer's retaliatory intent. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (2012). Claims based on direct evidence are evaluated under the mixed-motive framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 276-77 (1989) (O'Connor, J., concurring),[2] while claims based on circumstantial evidence are assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Henson argues that he has submitted direct evidence such that we should apply the mixed-motive framework to his claims. We agree with the District Court, however, that Henson has not presented any direct evidence showing that he was terminated because of his decision to take FMLA leave. Direct evidence would be "evidence of discriminatory attitudes about [the FMLA] that were causally related to the decision to fire [Henson]." Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). "[S]tatements made by non-decision makers or by a decision maker unrelated to the decisional process itself are not direct evidence." Id. at 513 (citing Price Waterhouse, 490 U.S. at 277). Henson has not demonstrated that the general statements made by his supervisors – for example,

---

[2] We note that this Court has not decided whether mixed-motive claims under the FMLA are still viable after the Supreme Court's decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009). See Lichtenstein, 691 F.3d at 302 ("leav[ing] for another day our resolution of whether the FMLA continues to allow mixed-motive claims in the wake of Gross"). Because we hold that Henson has not presented direct evidence, we need not decide the issue.

Conway's reference to the FMLA as the "fraudulent medical leave act" – were linked to the decision to terminate him.

Accordingly, we must apply the burden-shifting framework set forth in McDonnell Douglas. Under that framework, a plaintiff must first establish a prima facie case of discrimination by showing that: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). If the plaintiff succeeds, then the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. at 146. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination. Id.

We agree with the District Court that Henson has failed to make out a prima facie case of discrimination because he has not submitted sufficient evidence of a causal connection between his FMLA leave and his termination. Although Henson was terminated during a FMLA period, this was not the first occasion on which he invoked his FMLA rights. Henson requested and was granted FMLA leave on numerous occasions during his six years of employment, and he never faced any negative consequences for taking such leave. Moreover, Henson has not demonstrated that Lebb's or Conway's negative comments about employees taking FMLA leave were connected in any way to his own termination.

Even if Henson could establish a prima facie case of FMLA retaliation, we would affirm because U.S. Foods has provided a legitimate, non-discriminatory reason for

8

terminating him – his insubordination and lack of remorse for the August 31, 2010 incident – and Henson has failed to offer sufficient evidence that U.S. Foods' reason is pretext for discrimination. In support of his pretext argument, Henson asserts that: (1) U.S. Foods incorrectly labeled his actions as insubordination, rather than a mere failure to follow instructions; (2) Conway lacks credibility; (3) other employees engaged in similar or worse conduct but were treated more favorably; and (4) other employees claim to have faced retaliation for taking FMLA leave.[3] We agree with the District Court that these claims are unsupported by the record and insufficient as a matter of law to show pretext.

Accordingly, we will affirm the District Court's grant of summary judgment with respect to Henson's FMLA retaliation claim.

B.

To establish a claim for hostile work environment based on race under the NJLAD, a plaintiff must prove that a defendant's conduct (1) would not have occurred but for the employee's race; and that the conduct was (2) severe or pervasive enough to make a (3) reasonable person of the plaintiff's race believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998). To determine whether an environment is hostile or abusive, courts must "look[] at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening

---

[3] To establish pretext, a plaintiff must offer evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." El-Sioufi v. St. Peter's Univ. Hosp., 887 A.2d 1170 (N.J. Super. 2005) (citations omitted).

Henson asserts that Conway's racial jokes and comments during his lunch break created a hostile work environment. While we do not condone Conway's offensive remarks in any way, we must agree with the District Court that these remarks alone were insufficient to create a hostile work environment at U.S. Foods. Henson has not shown that these comments were so severe and pervasive that a reasonable person in his position would believe that the conditions of his employment were altered.

Thus, we will affirm the District Court's grant of summary judgment with respect to Henson's NJLAD hostile work environment claim.

IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

10