955 A.2d 304 (2008)
402 N.J. Super. 465
Grant SPINKS, Robert Kovacs, and Michael Exley, Plaintiffs-Appellants,
v.
The TOWNSHIP OF CLINTON, Stephen Clancy, Individually and as Chief of Police of the Township of Clinton, Dwight Runyon, Individually and as an employee of the Township of Clinton, and Wayne Weiss, Individually and as an employee of the Township of Clinton, Defendants-Respondents.
No. A-4522-05T1.
Superior Court of New Jersey, Appellate Division.
Argued March 12, 2008.
Decided September 11, 2008.
*306 Arthur G. Nevins, Jr., Jersey City, argued the cause for appellants.
Rosaria Suriano, Newark, argued the cause for respondent The Township of Clinton (Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman, attorneys; Ms. Suriano and Marianne C. Tolomeo, on the brief).
Bruce A. Seidman, Roseland, argued the cause for respondent Stephen Clancy (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Mr. Seidman and Frank P. Leanza, on the brief).
Before Judges WEFING, PARKER and LYONS.
The opinion of the court was delivered by
LYONS, J.A.D.
Plaintiffs Grant Spinks, Robert Kovacs, and Michael Exley appeal from two orders entered on March 27, 2006, granting summary judgment to defendant The Township of Clinton (Clinton) and defendant Stephen Clancy (Clancy) dismissing plaintiffs' complaint in its entirety. Plaintiffs' complaint alleged retaliation by defendants in violation of plaintiffs' civil rights pursuant to 42 U.S.C.A. § 1983 and unlawful termination based upon age in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12. After a careful review of the contentions raised by plaintiffs, we affirm.
The following factual and procedural history is relevant to our consideration of the issues advanced on appeal. Plaintiffs were police officers in Clinton. In 2001, the police department conducted an internal investigation based on complaints of malingering by some officers. The investigation revealed that several officers, including the three plaintiffs, had filed false time reports and had been idle when they claimed to be working. Clinton submitted that information to the county prosecutor, who filed criminal charges. In November 2001, plaintiffs pled guilty to falsifying documents, were admitted into a pre-trial intervention program, resigned their positions as police officers, and stipulated they would not work again in law enforcement in New Jersey.
In January 2000, plaintiffs and other PBA members had filed an unfair practice charge with the Public Employment Relations Commission (PERC) challenging the new promotional procedure adopted by Clancy in September 1999, which had resulted in some officers being promoted over plaintiffs, despite plaintiffs' greater seniority. Plaintiffs and three other officers also challenged the new procedure in a February 2000 Law Division complaint. The complaint contained three counts. In count one, the complaint alleged that the new promotional process allowed some less senior officers to be promoted over plaintiffs and contained inadequate standards to guide the selection process. Plaintiffs claimed that they were denied rights under the First, Fifth, and Fourteenth Amendments, and sought relief pursuant to 42 U.S.C.A. § 1983.
*307 In count two, plaintiffs asserted that the new promotional process "was totally devoid of appropriate norms and standards," allowed defendants "unfettered discretion," and was so vague as to be "unintelligible and unenforceable." Plaintiffs again claimed violations of the First, Fifth, and Fourteenth Amendments, and sought relief pursuant to 42 U.S.C.A. § 1983.
In the third count of the complaint, plaintiffs complained that in a personnel order of September 16, 1999, the police department restricted all officers from posting or distributing any "unauthorized or unnecessary" documents on any "PBA maintained bulletin board" or in any mail slot used by the officers or PBA. That order, alleged plaintiffs, denied them their First Amendment freedom of speech, as well as their rights under 42 U.S.C.A. § 1983 and the First, Fourth, Fifth, and Fourteenth Amendments. In March 2000, the Law Division action was transferred to New Jersey Federal District Court.
In July 2000, the parties executed an Agreement and Release, by which plaintiffs agreed to dismiss with prejudice the pending PERC and District Court actions, and Clinton agreed to promote four of the complaining officers (including the plaintiffs here, Spinks, Kovacs, and Exley). In addition, the Agreement bound the parties to agree to accept the new collective bargaining agreement, covering 1999-2001, that had been negotiated and was awaiting approval.
In November 2000, as a result of complaints about the on-the-job conduct of patrol officers, Clancy ordered Sergeant Kuczynski (Kuczynski) of Internal Affairs to conduct a covert investigation. The complaints included "workplace harassment, stalking of an officer's wife, sexual liaisons by on-duty police officers, discontinued radio contact with officers, and idling of officers during certain shifts."
In preparation for the investigation, Kuczynski and Clancy met with the county prosecutor, Stephen Rubin (Rubin), to ask for permission to secretly install a global positioning device (GPS) in each patrol car. Rubin gave his permission. Kuczynski stated in his deposition that it was "[u]pon [Rubin's] order [that] the investigation commenced." Rubin ordered that all officers be monitored, not just the two against whom specific complaints had been made. The GPS unit was put in all cars, in random order, between May and August 2001. According to Kuczynski's investigation report, the prosecutor "was informed and assisted with support." In his deposition, Kuczynski explained that he gave all the data to Rubin, who decided on the criteria to be used to determine if criminal charges should be brought. Kuczynski elaborated as follows:
Immediately upon commencing with this investigation, Prosecutor Rubin, and every time I went to him with a report, indicated to me that the criteria if an officer was on location at any time during the entire eight-hour shift, it would not constitute in his mind falsification.
In other words, he was not going to prosecute an officer for sloppy record keeping, only on falsifications. So based upon that recommendation given to me numerous times, this officer, every officer was held to that standard and checked. And simply if there was any falsification or indication of falsification that was found on any officer, it was presented to Prosecutor Rubin. Prosecutor Rubin decided if he was going to exercise [sic] to prosecute this or refer to administrative issues.
He added: "All the prosecution decisions were made by the prosecutor and prosecutor's office."
Kuczynski presented all investigative reports to Rubin; Clancy never saw them. *308 In his deposition, Clancy confirmed that he had no personal role in the investigation aside from his initial meeting with Rubin, and that he never reviewed the results obtained by Kuczynski. Clancy and Kuczynski were the only Township employees aware of the investigation.
The GPS generated reports of the location of each officer at a given time. The GPS device was placed in each car at least twice. Whenever "serious discrepancies" were found in an officer's reports and the GPS data, the GPS unit was put in that car again, in order to determine if there were a "pattern of conduct." The trial judge accepted, for the purposes of the summary judgment motion, that the reports showed "that all or many officers, not just plaintiffs, were engaged in idling behavior, and failed to report it, and that it had been condoned in the past by the Township."
In August 2001, Detective Tavener (Tavener) of the prosecutor's office was assigned to "oversee" the investigation, and he met with Kuczynski "many times" to discuss the case. His task was to review the data and prepare the case for the prosecutor. Tavener felt that the investigation had been done "correctly and fairly."
As a result of the investigation, plaintiffs and Officer Brown were charged with falsification of documents in September 2001. In October 2001, Officer Krejdovski (Krejdovski) was arrested and charged. Plaintiffs did not and do not deny the falsification, arguing instead that other officers did the same, but were not similarly charged.
Some of the officers implicated in the investigation, other than plaintiffs, retired or resigned, and one went to trial and was convicted by a jury of falsifying documents. Plaintiffs each pled guilty to one count of falsifying documents and, as required by the plea agreement, resigned from the police department, entered the Pretrial Intervention Program, and agreed not to work again in law enforcement in New Jersey. All three had resigned by November 9, 2001.
In 2004, plaintiffs filed a Law Division action contending that the 2001 investigation had been commenced in retaliation for plaintiffs' 2000 challenges. In plaintiffs' second amended complaint of January 2004, they alleged that they had been forced to resign as police officers in 2001 because of defendants' 1) allegations of misconduct by plaintiffs, which were in retaliation for plaintiffs' successful 2000 legal actions; and 2) discrimination against plaintiffs because of their age, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Named as defendants were Clinton, Clancy, who was the police chief, and two lieutenants (Wayne Weiss and Dwight Runyon). Both Weiss and Runyon were dismissed by stipulation before summary judgment was entered and take no part in this appeal.
Clinton and Clancy filed separate answers, denying the allegations and asserting affirmative defenses. In February 2006, after the completion of discovery, each defendant moved for summary judgment, and plaintiffs opposed the motions.
The motions were argued before Judge Peter A. Buchsbaum on March 17, 2006. In a written opinion on March 27, 2006, Judge Buchsbaum granted summary judgment to both defendants, ruling that Clancy was protected by virtue of qualified immunity and that Clinton was not liable under either cause of action. The trial judge entered orders on the same date. Plaintiffs filed a timely notice of appeal.
On appeal, plaintiffs present the following arguments for our consideration:
POINT I

*309 THE JUDGE ERRED IN FINDING THAT THE PROSECUTOR WAS RESPONSIBLE FOR THE ADVERSE EMPLOYMENT ACTION.
POINT II
PLAINTIFFS' 42 U.S.C. SECTION 1983 CLAIM.
A. THE SCOPE OF PLAINTIFFS' SECTION 1983 CLAIM.
B. PLAINTIFFS' 1983 RETALIATION CLAIM.
POINT III
THE INTENTIONAL FALSE ARREST, MALICIOUS PROSECUTION AND DEFAMATION COMPONENTS OF PLAINTIFFS' SECTION 1983 CLAIMS.
POINT IV
LIABILITY UNDER NJLAD FOR AGE DISCRIMINATION AND RETALIATION N.J.S.A. 10:5-12D.
In reviewing the dismissal of a complaint on summary judgment, we apply the same legal standard as the trial court. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J.Super. 224, 230, 903 A.2d 513 (App.Div.), certif. denied, 189 N.J. 104, 912 A.2d 1264 (2006). A court must determine "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue[s] in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995); R. 4:46-2(c). If there is a genuine issue as to any material fact, or where credibility issues are presented, then summary judgment should be denied. Ibid.; R. 4:46-2(c). However, if the evidence "is `so one-sided that one party must prevail as a matter of law,'" then summary judgment should be granted. Ibid. (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).
Plaintiffs dispute Judge Buchsbaum's ruling that the retaliation count must fail because, even if there were a prohibited retaliation, that retaliation was attributable to the prosecutor, not to defendants. They insist that they at least raised a disputed fact question on this point, and that the trial judge wrongly resolved this question instead of submitting it to a jury.
In support of his ruling, the trial judge reasoned as follows:
[T]he actual termination resulted from plaintiffs' resignation which was clearly procured by the Prosecutor as a condition of not filing felony charges, plaintiffs' admission into Pretrial Intervention, and their being allowed to retain pension benefits. As is noted above, plaintiffs have agreed that he determined who and what to charge. Such decision was not a Township decision. Accordingly, plaintiffs have failed to show sufficient retaliatory actions. Nor do they make any claim that a mere investigation itself absent their resignation would constitute retaliation under 42 U.S.C. § 1983.
The trial judge also rejected plaintiffs' theory that the prosecutor was "simply a tool" of Clinton in effecting the retaliation:
[T]heir own concessions that Krejdovski was charged despite the Township's wishes, that the file on six other officers was turned over to the Prosecutor, and that two others left or resigned belies their assertion factually. Their further concession that the Prosecutor decided who and what to charge is likewise inconsistent with their "tool" theory.
On appeal, plaintiffs insist that "[t]he facts show [t]hey were investigated, charged, arrested, and suspended without *310 pay by the Township and then referred by Clancy to the Prosecutor." They say that Clancy "selectively reported the investigation results to the Prosecutor," and that there is "no concrete evidence that anyone from the Prosecutor's office even looked at the disks which contain the actual trackings of each officer." Plaintiffs assert that "[t]he evidence shows that the Prosecutor's office saw only what Clancy and John Kuczynski wanted them to see."
Plaintiffs cite no such "evidence." Nor do they specify items in the record to support their allegations that Clancy and Kuczynski were selective in their investigative reports to the prosecutor and that their reports were "false and misleading."[1] Instead, plaintiffs invite us to peruse evidence that they state is contained in sixty-one pages of the appendix and for us to review seven computer disks and one CD recording of the "GPS" trackings. We are assured that when we compare "the trackings to Kuczynski's reports to the prosecutor, the misrepresentations become readily and clearly apparent." Plaintiffs ignore the fact that it is their responsibility to refer us to specific parts of the record to support their argument. They may not discharge that duty by inviting us to search through the record ourselves. State v. Hild, 148 N.J.Super. 294, 296, 372 A.2d 642 (App.Div.1977). It is improper to request us to scour sixty-one pages of plaintiffs' appendix, as well as computer disks without informing us of what particular pages supposedly support their argument.
Clinton counters that it was undisputed that the prosecutor made the decision to charge plaintiffs; that plaintiffs resigned as a condition of their plea bargain with the prosecutor; and that they were not terminated by Clinton. Moreover, it states that the record confirms that the prosecutor was not a mere tool of Clinton in that the prosecutor charged another officer, Krejdovski, "despite the Township's wishes" (quoting the trial judge's opinion).
Clancy's response to plaintiffs' theory is as follows:
[T]he uncontroverted evidence is that Chief Clancy initially only intended to utilize the GPS in the patrol cars of two officers. It was the Prosecutor who issued an order to Sgt. Kuczynski to expand the scope of the Investigation to include the random placement of the GPS into all Division vehicles in order to investigate all Division officers.
He adds: "Plaintiffs fail to appreciate that they were charged by the Prosecutor with criminal violations. Chief Clancy had no choice but to suspend them from the police force. However, the catalyst for the suspension was the Charges."
The record adequately supports Judge Buchsbaum's ruling on this point. In contrast to plaintiffs' unattributed claims in their brief, the record uniformly points to the prosecutor as being the one who directed the details of the investigation and decided to charge plaintiffs. We note that Kuczynski himself, the officer in charge of the investigation for Clinton, stated that it was the prosecutor who ordered the investigation, authorized use of the GPS, and made all decisions whether to prosecute.
Plaintiffs failed to show any genuine factual dispute on this issue. See R. 4:46-5(a). Accordingly, we concur with the trial judge's ruling that there was no "adverse employment action" by defendants.
*311 Plaintiffs also challenge the trial judge's decision concerning plaintiffs' 42 U.S.C.A. § 1983 claim. Judge Buchsbaum, citing Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir.1995), applied a three-part test to determine whether plaintiffs stated a 42 U.S.C.A. § 1983 claim for retaliation for engaging in a constitutionally protected activity. The Watters test requires a court to analyze whether 1) the employee did engage in protected conduct; 2) that protected conduct was a substantial or motivating factor in the alleged retaliation; and 3) the retaliatory action would not have occurred if the employee had not engaged in the protected activity. Ibid.
In applying the first factor, Judge Buchsbaum analyzed the three counts of plaintiffs' 42 U.S.C.A. § 1983 complaint, which had been filed in 2000, to determine whether the filing of that complaint qualified as "protected activity." He construed "protected activity" to mean the freedom-of-speech guarantee of the First Amendment, and he applied the United States Supreme Court's guideline that, when a public employee alleges retaliation for exercising freedom-of-speech, he or she must show that the speech in question addressed a "matter of public concern." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 719 (1983). The Court defined such a matter as one that can "be fairly considered as relating to any matter of political, social, or other concern to the community." Ibid.
The trial judge then observed that the first count alleged that the Township's new promotion process allowed officers with less experience than plaintiffs to be promoted before plaintiffs. He found that the second count asserted that the new process gave unfettered discretion to the Township and ignored the officers' actual performance. Both counts, ruled the trial judge, were not protected activity that could give rise to a 42 U.S.C.A. § 1983 action:
[T]he first two counts of the complaint deal entirely with an internal action taken within the workplace. The internal promotion process followed by the Police Department does not relate to a matter of political or social concern to the community at large. Thus, it relates only to matters of personal interest and not to matters of public concern, and a Section 1983 action cannot lie with regard to Clinton's response to these claims.
The third count, the trial judge said, protested Clinton's prohibition on posting or distributing unauthorized documents. That form of expression, the trial judge ruled, involved "matters of internal personnel policy and personal interest and not matters of public concern." Thus, that count also failed the first prong of a valid retaliation claim.
Having concluded that the first of the three prongs was not established, the trial judge ruled that he did not have to reach the second and third prongs of the test. He opined, however, that those factors were disputed and thus would not have been amenable to summary judgment. Plaintiffs dispute the trial judge's conclusion concerning the first prong of the three-part test.
Plaintiffs' argue that the trial judge was wrong in determining their alleged protected conduct was not a matter of public concern, stating:
Public interest and community concern over the promotions action were repeatedly expressed in the local papers from the filing of the action to the global settlement and appointment of a committee to set promotion standards. The public concerns involved qualifications of the promoted officers without objective standards and competitive tests, the influence of politics over promotions, and *312 the impact of the action on the PBA/ Township contract negotiations, among other issues.
The resulting "appointment of inexperienced and unqualified officers," add plaintiffs, "was of great concern to both the PBA and the public at large as it affected public security and confidence."
Clinton counters, in agreement with Judge Buchsbaum's finding that "plaintiffs' prior complaints focused on pay, promotion, and internal regulations regarding distribution of literature and notices within the police department.... Internal promotions and communication policies are not of general concern to the public at large." Clinton correctly cites the Supreme Court's position that public employees' personnel grievances do not qualify as conduct protected by the First Amendment freedom of speech. Garcetti v. Ceballos, 547 U.S. 410, 420, 126 S.Ct. 1951, 1959, 164 L.Ed.2d 689, 700 (2006); Connick, supra, 461 U.S. at 149, 103 S.Ct. at 1691, 75 L.Ed.2d at 721.
We agree with the trial judge's analysis. Even granting plaintiffs the benefit of all favorable inferences, their complaints concerned how the administration of the police department and management of its personnel affected plaintiffs and their bargaining unit. While it may be true that some of the controversy was reported in the newspapers, and that the public does have an interest in its police force, those alleged public interests do not change or overshadow the primary thrust of plaintiffs' complaint  their personal employment grievances. Ibid. The Supreme Court has said, "the First Amendment does not empower public employees to `constitutionalize the employee grievance.'" Garcetti, supra, 547 U.S. at 420, 126 S.Ct. at 1959, 164 L.Ed.2d at 700 (quoting Connick, supra, 461 U.S. at 154, 103 S.Ct. at 1694, 75 L.Ed.2d at 725).
Plaintiffs propose an additional theory for reversal concerning 42 U.S.C.A. § 1983. They contend that the trial judge read their 2004 complaint too narrowly, arguing it encompassed more than their First Amendment free-speech right to file their 2000 actions, but that it also included "their constitutional right to sue under 42 U.S.C.A. § 1983 for denial of due process and equal protection." The trial judge was wrong, argue plaintiffs, to use the "public interest" test, which applies only when the alleged protected activity was the exercise of the freedom of speech. They assert that their 2004 complaint did not even mention free speech. Rather, they were invoking a different clause of the First Amendment: the "petition clause," which forbids any law that abridges the right "to petition the Government for a redress of grievances." U.S. Const. amend. I.
Clinton does not respond to plaintiffs' petition-clause theory, insisting that plaintiffs waived this issue by not raising it below. Plaintiffs reply that they did raise it. First, they point to paragraph fourteen of their complaint, in which they referred to their "successful pursuit of their constitutional employment and equal protection rights in prior actions under the U.S. Constitution and 42 U.S.C. Section 1983." And they look to paragraph sixteen, which alleges retaliation for their "prior successful assertion of their civil rights," and that defendants deprived them of their "civil and constitutional rights, privileges and immunities and equal protection rights secured by the First, Fifth, and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. Section 1983." Plaintiffs insist that these allegations served to raise the petition-clause question, and they also claim that the issue was discussed at oral argument.
*313 Neither the amended complaint nor the oral argument contained specific references to the petition clause. Plaintiffs' counsel's references at oral argument were similarly imprecise: "There was a 1983-case brought, that the plaintiffs had the right under the constitution to bring that case." The trial judge did not mention such an argument in his opinion. We agree with Clinton that on this record plaintiffs cannot fairly claim to have raised below the petition-clause argument that they now raise on appeal. As the issue was not timely raised before the trial court, we need not consider it. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
Plaintiffs also dispute the trial judge's alternative reason for granting summary judgment to Clancy, namely, that he was qualifiedly immune from 42 U.S.C.A. § 1983 liability. Qualified immunity is an affirmative defense to liability. Schneider v. Simonini, 163 N.J. 336, 354, 749 A.2d 336 (2000), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001). As to defendant Clancy only, Judge Buchsbaum ruled that, in addition to Clancy being dismissed as a party by way of summary judgment because plaintiffs had not raised a factual dispute concerning their retaliation cause of action, Clancy had also succeeded in establishing his defense of qualified immunity. The trial judge applied the rule that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). And he acknowledged the Court's two-part test for qualified immunity: 1) the officer violated a constitutional right of a plaintiff, and 2) that right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001).
The test for the second part  whether the right was known with sufficient clarity  "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, supra, 533 U.S. at 202, 121 S.Ct. at 2156, 150 L.Ed.2d at 282. When, as here, plaintiffs claim that a police officer acted without probable cause, the Saucier test is refined to require that an officer seeking immunity prove that: 1) he did have probable cause, or 2) even if he did not have probable cause, he reasonably believed that he did. Schneider, supra, 163 N.J. at 355, 749 A.2d 336.
In this case, Judge Buchsbaum ruled, "there was no clear constitutional right barring retaliation via an investigation for litigating § 1983 claims." While plaintiffs alleged at oral argument that Clancy had procured a false arrest  thereby implicating their Fourth Amendment rights  they never pleaded false arrest in their complaint, and it was the prosecutor, not Clancy, who prompted the arrest. And, noted the trial judge, even if there were a false arrest,
a reasonable person in Chief Clancy's position at the time he initiated the GPS investigation, or turned it over to the Prosecutor, would not have known this.... [T]he charges here were made entirely at the discretion of the Prosecutor's office. Defendant Clancy cannot be charged with clear foreknowledge of what rights even a biased submission of facts to the Prosecutor would affect.
With respect to plaintiffs' no-probable-cause theory, the trial judge observed that Clancy was not the one who arrested and charged plaintiffs; that was the prosecutor, who "is not even a party to this case." *314 And he noted that plaintiffs had pleaded guilty and otherwise admitted the offenses; thus "they are now in no position to claim an absence of probable cause for their arrest." Thus, concluded Judge Buchsbaum, Clancy was immune from Section 1983 liability.
On appeal, plaintiffs argue that, accepting their allegations as true, Clancy had no probable cause to conclude that plaintiffs were guilty of any crime, in that their misreporting of their whereabouts was accepted and condoned by the police department. They insist that Clancy's act of turning plaintiffs over to the prosecutor was not merely negligence or bad judgment (for which he would be immune) but rather was "intentional bad faith and misconduct." And they again refer us to the disks and CD, which they say will show that Kuczynski's reports to the prosecutor were false and misleading. They conclude that, if a jury believed their evidence, it could award damages to plaintiffs on theories of false arrest, false imprisonment, malicious abuse of process, or malicious prosecution.
Clancy responds that plaintiffs' premise that there was no probable cause is negated by the fact that they pleaded guilty, and, as plaintiffs concede, if there was probable cause, Clancy was entitled to the defense of qualified immunity. Under the second part of the Saucier test, Clancy reasonably believed that his actions were proper. In fact, argues Clancy, he had no involvement in expanding the investigation to include plaintiffs. While he commenced the investigation, that investigation was of two officers not among these three plaintiffs. It was the prosecutor who expanded it to include plaintiffs. In reply, plaintiffs dispute Clancy's factual representations, saying that they must be resolved by a jury.
While bad faith is normally a jury question, plaintiffs offer no citations to the record that might support their characterization of Clancy's conduct, as required by Rule 4:46-5(a). Plaintiffs' general references to the disks and CD is insufficient to show a genuine issue of material fact. Therefore, we agree with the trial judge's ruling that Clancy enjoyed a qualified immunity from 42 U.S.C.A. § 1983 liability.
Plaintiffs further complain that Judge Buchsbaum erred in dismissing their LAD claims contained in count two of their complaint. They contend that the trial judge treated their cause of action as a disparate-treatment claim only, ignoring their disparate-impact and retaliation theories. They also object that the trial judge overlooked their allegations that the adverse employment actions included the investigation itself, plaintiffs' arrest, and plaintiffs' suspension.
In count two of their complaint, plaintiffs alleged that defendants discriminated against them because of their age (over forty). They listed a variety of acts having a disparate impact, representing disparate treatment, or constituting retaliatory action, including using the GPS investigation to entrap and terminate older employees, and preferring younger employees for promotions, overtime, and good assignments.
In assessing plaintiffs' claim of age discrimination, Judge Buchsbaum applied the burden-shifting analysis that governs such a claim. A plaintiff first must establish the four elements of a prima facie case of age discrimination: 1) he or she belonged to a protected class by reason of his or her age; 2) he or she was performing the job to the employer's satisfaction; 3) he or she was subjected to some adverse employment action; and 4) he or she was replaced by someone young enough to warrant an inference of age discrimination. Bergen Commercial Bank v. Sisler, 157 *315 N.J. 188, 212-13, 723 A.2d 944 (1999); Young v. Hobart West Group, 385 N.J.Super. 448, 458, 897 A.2d 1063 (App.Div. 2005).
Should a plaintiff succeed in constructing a prima facie case, age discrimination is presumed. The employer then must come forward with evidence of a non-discriminatory reason for the adverse action, and, if it does so, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the claimed reason was a pretext for age discrimination. Bergen Commercial Bank, supra, 157 N.J. at 210-11, 723 A.2d 944.
Judge Buchsbaum noted that defendants had conceded for the purpose of the motion elements one, two, and four of the prima facie case, leaving only the third element in dispute  whether defendants subjected plaintiffs to any sort of adverse employment action. For the purposes of the summary judgment motion, the trial judge accepted plaintiffs' claim that defendants used the GPS investigation as a "tool" to single out older employees, like plaintiffs, and to remove them from the police department even though officers of all ages were guilty of the same conduct. But, he ruled, plaintiffs could not show that the resulting adverse actions  their resignations as a condition of their plea agreements  were attributable to defendants; rather, they were the prosecutor's responsibility. The judge explained:
However, plaintiffs concede as they must that they were not terminated by the Township. Rather, they resigned as part of the plea agreement reached with the Prosecutor's office in the face of an indictment for misconduct in office.... Moreover, they concede that a total of thirteen officers were referred to the Prosecutor's office at some point and that the decision on whom and what to charge was his.
Here, the decision to charge plaintiffs with crimes and to reach plea agreements with them rested solely with the Prosecutor's office. During the investigation, Prosecutor Rubin and his staff reviewed each of the GPS reports to determine whether a "pattern of misconduct" was established against a particular officer, and he had the ultimate discretion to determine whether an officer was charged with a crime and prosecuted.... The Prosecutor procured the plea agreement that included plaintiffs' resignations. Clinton Township did not fire them.
Thus, concluded the trial judge, plaintiffs could not show that Clinton took an adverse action against them. As for defendant Clancy, plaintiffs' LAD claim also failed, the trial judge ruled, because "an individual within a public entity may only be held liable under N.J.S.A. 10:5-12 if he is an `aider or abettor.' Otherwise, only the entity itself can be held liable." But, observed the trial judge, Clancy was not merely an aider or abettor; he was Clinton's main decision-maker with respect to the GPS investigation. Thus, he could not be individually liable, and he, too, was entitled to summary judgment on the LAD count.
On appeal, plaintiffs argue various errors in the trial judge's opinion. They say that the trial judge considered their plea-bargained resignation to be the only relevant adverse employment action, and that, because that resignation was negotiated by the prosecutor, there was no adverse action by defendants. But, they argue, the trial judge ignored plaintiffs' claims that an adverse action was "the Township's immediate suspension of the plaintiffs first with, then without pay from the date of the arrest until the date of the resignation." And they insist that "the investigation itself was retaliatory" and, thus, that it too *316 qualified as an adverse action. They elaborate as follows:
The criminal accusations themselves, publicized as they were by the Township, caused great embarrassment and humiliation, the three months suspension partially without pay, the necessity and cost of hiring attorneys and all the adverse publicity sought from the defendants' media releases, and the continuing coverage in the local press all caused the plaintiffs great damage, whether or not they ultimately resigned.
Judge Buchsbaum expressly ruled that the investigation itself was not an adverse action:
Plaintiffs do not claim an NJLAD action would lie if the investigation had terminated without their resignation. Nor could they. An investigation or even an unfavorable personnel report without more does not constitute adverse employment action under the NJLAD. El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J.Super. 145, 170, 887 A.2d 1170 (App. Div.2005).
Plaintiffs dispute the trial judge's premise that they are not claiming that the investigation was an adverse action, and they disagree with the trial judge's reading of El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J.Super. 145, 887 A.2d 1170 (App. Div.2005). They concede that El-Sioufi "stands for the proposition that a claim of an unfavorable personnel report or a negative investigation accompanied by no tangible detriment is insufficient to rise to the level of an adverse employment decision." But that ruling "is in no way analogous to the retaliatory actions claimed by plaintiffs here."
We agree with the trial judge. An employer must be free to investigate complaints of employee misconduct without fear of LAD liability. Only when the investigation results in some real detriment, such as a suspension, demotion, or termination, should the aggrieved employee be able to invoke the protection of the LAD. El-Sioufi, supra, 382 N.J.Super. at 169-70, 887 A.2d 1170. Cf. Beasley v. Passaic County, 377 N.J.Super. 585, 606, 873 A.2d 673 (App.Div.2005) (in the CEPA context, "an investigation of an employee is not normally considered retaliation"). Here plaintiffs do allege real detriments  the suspension and forced resignation. Thus, they could still prevail against defendants if they can establish that either of those two actions qualified as an adverse action for which defendants are responsible.
Those two alleged actions, suspension and forced resignation, concededly do constitute adverse actions, but the trial judge's key ruling was that those actions were chargeable to the prosecutor, not to defendants. We agree with the trial judge that the record indicates that both the resignations and the suspensions were the result of the fabrication charges brought by the prosecutor and were not brought about by defendants.
With respect to the trial judge's dismissal of the LAD claim as to Clancy, plaintiffs do not argue against the trial judge's "aiding and abetting" theory in their merits brief, arguing only against the ruling as to Clinton. Clancy argues in favor of the trial judge's rationale, noting that in Tarr v. Ciasulli, 181 N.J. 70, 83, 853 A.2d 921 (2004), the Court held that, based on its reading of N.J.S.A. 10:5-5(a), which defines "employer" for LAD purposes, "an individual supervisor is not defined as an `employer' under the LAD." Instead, such a supervisor may be personally liable only as an aider or abettor of the employer's conduct. Id. at 83-84, 853 A.2d 921.
In response to Clancy's argument, plaintiffs addressed the issue for the first time in their reply brief.
*317 Accepting the inferences most favorable to plaintiffs, the trial judge observed that Clancy, as police chief, was an employee of Clinton who, on behalf of Clinton, made the relevant investigative decisions before enlisting the prosecutor; Clancy had nothing further to do with the case. The record supports that observation. Plaintiffs counter with unsubstantiated representations, citing no part of the record, except for two pages. They cite page Pa2629 of their appendix for the proposition that it was Clancy who supervised plaintiffs' arrests and decided whose files to send to the prosecutor's office. But that page does not refer to Clancy at all. It is a memo from Kuczynski sending four unnamed files to someone named Chief Nicholas Susalis.
Plaintiffs' other citation is to an investigative report at page Pa2995 of their appendix, which they say shows that Clancy "directed Kuczynski as to who's [sic] car to place the GPS unit in, when to do it, and how often." That is true, but it is incomplete to the extent plaintiffs imply that Clancy made those choices to discriminate against plaintiffs. The same report acknowledges that the GPS units were installed on all patrol cars and in a random order. It reflects that Clancy decided the order of patrol cars to be surveilled, but it does not support an argument that his chosen sequence was discriminatory.
We are satisfied, therefore, that the trial judge appropriately ruled that plaintiffs had not established a material factual issue as to the "adverse employment action" element of a prima facie case of age discrimination.
Accordingly, for the reasons stated herein, as well as those contained in the thoughtful, detailed, and considered opinion of Judge Buchsbaum, we affirm.
NOTES
[1] To the contrary, in his deposition, Clancy confirmed that he had no personal role in the investigation aside from his initial meeting with Rubin, and that he never reviewed the results obtained by Kuczynski.