NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0347-10T1

MICHAEL A. WALTER BUILDERS, INC.,

 Plaintiff-Respondent,

v.

BARBARA BEDNAR,

 Defendant-Appellant.
_______________________________

 Telephonically argued June 3, 2011 –
 Decided September 23, 2011

 Before Judges R. B. Coleman, Lihotz and
 J. N. Harris.

 On appeal from the Superior Court of New
 Jersey, Law Division, Cape May County,
 Docket No. L-553-04.

 Keith A. Bonchi argued the cause for
 appellant (Goldenberg, Mackler, Sayegh,
 Mintz, Pfeffer, Bonchi & Gill, attorneys;
 Mr. Bonchi, of counsel and on the briefs;
 Rosann Allen, on the briefs).

 Stephen W. Barry argued the cause for
 respondent (Barry, Corrado, Grassi & Gibson,
 P.C., attorneys; Mr. Barry, on the brief).

PER CURIAM

 Defendant Barbara Bednar appeals from a final judgment

granting relief to plaintiff Michael A. Walter Builders, Inc.

following a bench trial, and an order dismissing her
counterclaim. On appeal, defendant argues the trial court's

factual findings are not supported by the record and certain

legal conclusions supporting the relief ordered in favor of

plaintiff and in dismissing her counterclaim were reached in

error. We affirm.

 These facts are contained in the trial record. Defendant

owned the Heritage Inn Motel in Cape May. Defendant had

obtained architectural and mechanical drawings for the motel's

proposed modifications that were prepared by architect Blane

Steinman, mechanical engineer John Schade, P.E., and structural

engineer Tom Shepard. After reviewing these materials,

plaintiff's principal, Michael A. Walter, drafted estimates for

completion of the job and submitted his "Proposal" dated

November 20, 2003, which was accepted by defendant. In the

contract, plaintiff, designated as "the Builder," would

construct a third-floor addition to the motel and perform other

renovations1 for defendant, designated as "the Customer," for the

agreed sum of $1,037,300.

 Certain provisions of the proposal as accepted by the

parties as their contract are relevant to our review. First,

1
 Plaintiff had drafted three proposals for defendant, the
last of which was executed by the parties bearing the date of
November 20, 2003 but actually signed sometime in late January
2004.

 2 A-0347-10T1
the proposal expressly incorporated Steinman's architectural

plans that utilized Schade's mechanical specifications for

thirty-three Mitsubishi "heat pump systems at 14,500 BTUs

cooling."2 Also, the plans required each room to be equipped

with condenser and air handling units from the same manufacturer

with the same energy output of 14,500 BTUs.

 Second, the agreement included a payment schedule to

provide fourteen draws. Each draw was in a stated amount and

was due upon completion of various stages of the project.

 Third, all renovations and the addition were to be

completed within six months from the date construction

commenced, or by May 20, 2004. The agreement allowed a thirty-

day extension for weather-related delays.

 Fourth, additional general provisions: (1) mandated any

changes were not effective "unless in writing, signed by both

Builder and Customer"; (2) required builders' risk insurance be

"provided by [the] Builder to [the] Customer for [the] new

2
 A BTU, short for British Thermal Unit, is a basic measure
of thermal energy. One BTU is the amount of energy needed to
heat one pound of water one degree Fahrenheit, measured at its
heaviest point. When speaking of cooling power, the BTU works
in reverse. The air-cooling power of an air conditioning system
refers to the amount of thermal energy removed from an area.
The higher the BTU output, the more powerful the heating or
cooling. http://www.eia.gov/emeu/consumptionbriefs/cbecs/
pbawebsite/office/office_refbtu.htm (last visited August 30,
2011).

 3 A-0347-10T1
addition" and the Customer would provide home-owner's insurance

"for [the] existing hotel"; (3) provided the "Builder will

guarantee all workmanship of [the B]uilder and all of [the]

Builder's Subcontractors, for one year from the day of

settlement."

 Two additional provisions listed under "Additional Clauses"

must also be mentioned. Subsection (F) stated, in pertinent

part:

 Additional work may be performed on hotel.
 Cost for work will be priced by Builder and
 accepted by Customer. A spreadsheet for
 additional items will be provided and
 updated by Builder periodically. . . .
 Payments for work shall be made the
 beginning of each month, during
 construction. Ongoing cost for additional
 work shall not exceed 2% of the total house
 [sic] construction cost, as stated [i]n this
 [c]ontract.

 Additional work performed will affect the
 time of [a]ddition/renovation completion.
 . . .

and subsection (J) provided:

 Failure to insist upon strict compliance
 with any of the terms, covenants or
 conditions hereof shall not be deemed a
 waiver of such term, covenant or condition,
 nor shall any waiver or relinquishment of
 any right or power hereunder at any one or
 more times be deemed a waiver or
 relinquishment of such right or power at any
 other time.

 4 A-0347-10T1
 The construction did not proceed smoothly. We will discuss

the dilemmas which bear on the parties' claims in litigation.

 As the details of the agreement were ironed out, plaintiff

commenced demolition on November 20, 2003. The first step was

to remove the second floor ceilings, erect scaffolding, and

construct the third-floor "block walls" atop the second floor.

Plaintiff used subcontractors for this job. It was decided the

second floor roofing would be removed and the block for the

third-floor wall would be laid in a piecemeal fashion because of

"weather concerns." Walter explained:

 [Y]ou just can't build a wall straight
 up and then build the back wall and
 then another side wall . . . [i]t has
 to be done simultaneously with another
 room. . . . Because a block wall might
 be up six feet, another block wall
 might be up four foot, another one up
 two foot. So, it wasn't on a level
 plane where we could put boards across
 and tarp [the open roof] . . . .

 To protect the property from water damage during this

process, plaintiff placed a tarp over the block walls and laid

wooden planks on the tarps to hold them in place. Also, a rope

was woven through the eyelets of the tarps and tied to the sides

of the building.

 During November and December 2003, before the new roof was

shingled, three rainstorms occurred. Notwithstanding the

protective measures employed, "[w]hen the storms came through,

 5 A-0347-10T1
there [were] heavy winds that ripped the tarps off and water got

into the [m]otel." After the first storm in November, plaintiff

added ropes and tarps, but "still the storm[water] got in[,]"

damaging the sheetrock ceilings of the first floor, the first

and second-floor carpeting, and some of the furniture stored in

the first-floor rooms.

 Upon discovering the extent of the damage, plaintiff

suggested the parties' submit claims to their respective

insurance carriers. Plaintiff hired subcontractors to restore

the existing structure. This work included installing new

sheetrock on the ceilings and walls; removing the old and

installing new carpeting; repairing bathroom tile damage and

"put[ting] new trim [], new doors, and paint" on the walls. At

the same time, plaintiff continued construction of the third

floor, believing "the insurance companies would take care of the

cost[s]" which the parties would "sort[] out later."

 Because of these construction delays, the parties agreed

the new third-floor guest rooms would be finished for the summer

and the meeting room, exercise room, and owner's quarters could

be completed in the fall. Although the third-floor rental rooms

were completed on May 26, 2004, restoration of the first and

second floor rooms was not completed until immediately prior to

the July Fourth weekend.

 6 A-0347-10T1
 Another problem resulted regarding the heating, ventilation

and air conditioning (HVAC) installation. First, plaintiff and

the architect agreed to deviate from the contract

specifications, and installed the condenser units on a

fiberglass deck located on the roof. Consequently, some

condensers were closer to some rooms, "both vertically and

horizontally[,]" than originally designed. Second, plaintiff

learned the Mitsubishi 14,500 BTU condenser and air handling

units specified by the mechanical engineer's drawings were

unavailable as "[t]here was no such thing." Walter consulted

with defendant and outlined the attempts to find a comparable

unit. Defendant expressed concern regarding the efficiency of

any proposed units. On April 7, 2004, plaintiff presented

defendant with three options, set forth in a written "additional

work authorization." On May 4, 2004, defendant chose the second

alternative listed, requesting the proposed units be upgraded to

larger units. She told Walter she desired plaintiff install a

17,000 BTU condenser and Arcoaire air handling units

manufactured by Bryant. Walter inserted this information into

the additional work authorization, which he signed that day.

 In July or August 2004, defendant expressed concern that

the air conditioning units were "getting cool too fast and some

mold was being created" in some of the rooms. At trial,

 7 A-0347-10T1
defendant asserted she never experienced a mold or mildew

problem in any motel rooms prior to hiring plaintiff. Further,

she expressed that for the first time she began receiving

complaints from guests about dampness in rooms. Plaintiff

observed mold growth which was confined to the first floor and

attributed it to leaky pipes that "weren't pitched properly" in

a downstairs crawlspace. Defendant retained a different

contractor to remove and replace the HVAC units at a cost of

$117,895.98.

 The last payment defendant provided to plaintiff -- the

eleventh draw -- was in May 2004. On June 24, 2004, plaintiff

requested the twelfth draw. After plaintiff made three

additional requests for payment, defendant allegedly responded,

stating she had no more money.

 Plaintiff filed its two count complaint, alleging breach of

contract and misrepresentation. Specifically, plaintiff sought

payment under the contract for services rendered totaling

$148,100, expenditures for storm damage repairs amounting to

$120,000 and "extras" of $60,694. Additionally, it alleged

defendant fraudulently induced plaintiff to provide services for

which she had no intention of paying.

 Defendant denied an obligation to plaintiff and filed a

five-count counterclaim. She asserted breach of contract,

 8 A-0347-10T1
consumer fraud, breach of express and implied warranties, common

law fraud, and negligence. Defendant sought rescission of the

contract and return of the $971,705 she had paid plaintiff along

with compensatory damages resulting from plaintiff's failure to

follow the contract's specifications, lost profits, interest,

costs, and attorney's fees.3

 The seven day bench trial began on December 2, 2008. In

addition to the parties' testimony concerning the contract and

construction, they each presented fact and expert witnesses.

With regard to the HVAC units, plaintiff offered Jim Berry, the

principal of the HVAC subcontractor, who testified the installed

units were marketed at approximately 17,000 BTUs but as a result

of installation, specifically the length of the refrigerant line

between the condenser and air handler, a loss of capacity

resulted in an average effective BTU capacity of 14,960.

Defendant's expert, Frank A. Vinciguerra, inspected the motel in

December, noting the rooms "were humid, very humid, and many

areas had mold growth within them." He concluded the units were

oversized, caused short-cycling, and had an "inability to

dehumidify spaces." He countered Berry's assertions, opining

3
 Defendant later amended her pleadings to include a third-
party complaint against nineteen additional parties, including
the subcontractors and their respective insurers. Each of these
parties settled the claims or were dismissed prior to trial.

 9 A-0347-10T1
the reduction in capacity caused by the length of the lines was

irrelevant since "the ability to control humidity" is not the

same as effective cooling.

 Defendant also offered expert testimony of Sander J.

Greenberg, who quantified her lost revenue between $140,000 and

$240,000. This was rebutted by plaintiff's accountant, James A.

Stavros, who maintained Greenberg's methodology did not "follow

the standards set forth by the [American Institute of Certified

Public Accountants]" for the calculation of lost profits,

because he failed to specify a "period of loss" and exaggerated

potential lost profits of the motel by including business loses

of another entity owned by defendant.

 In a written opinion, the trial judge found defendant, not

plaintiff, unilaterally breached the contract by ceasing the

scheduled payments for completed work. The judge considered the

parties' testimony. He rejected, as incredible, defendant's

assertions plaintiff assumed full responsibility to pay for the

storm damage repair costs and that plaintiff never asked for the

twelfth draw. Conversely, the judge noted plaintiff's principal

was "straightforward and believable," and "kept meticulous notes

and records that record[ed] the dates he requested the next

draw." The trial court described the uncompleted items

discussed by defendant at trial as last-minute "punch list

 10 A-0347-10T1
items," which would have been completed by plaintiff had

defendant not terminated the agreement and found defendant

failed to mitigate her lost revenue damages by her six month

delay in accepting her contractor's proposal to rectify the HVAC

problems.

 On the complaint, the court entered an order awarding

plaintiff damages of $221,752.57, plus prejudgment interest and

costs of $42,377.58. With respect to defendant's counterclaim,

the court considered only whether plaintiff breached the

parties' contract. He found no evidence of fraud or

misrepresentation by plaintiff, rather the court determined

plaintiff "met the standard of good faith, honesty in fact and

observance of fair dealing." The court declined to credit

Greenberg's expert opinion as to any claimed economic damages,

concluding "the delays were caused by a number of factors which

Greenberg did not take into account." The trial judge dismissed

Defendant's counterclaim with prejudice.

 On appeal, defendant argues the trial court erred in

concluding plaintiff had no liability as a result of the faulty

performance of the HVAC subcontractor and for failing to

properly secure the property from storms while work was

progressing. Finally, defendant argues plaintiff was not

 11 A-0347-10T1
entitled to the twelfth draw under the contract. We turn to our

review of these issues.

 The scope of our review of a non-jury case is limited.

Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011).

The findings on which a trial court bases its decision will "not

be disturbed unless they are so wholly insupportable as to

result in a denial of justice[.]" Rova Farms Resort v.

Investors Ins. Co., 65 N.J. 474, 483-84 (1974) (internal

citations and quotations omitted). On the other hand, although

a trial court's factual findings will not be overturned absent

an abuse of discretion, questions of law are subject to de novo

review. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372

(1999).

 Defendant first argues the trial court erred as a matter of

law in concluding the engagement of a subcontractor to install

the HVAC units shielded plaintiff as the general contractor from

liability for alleged resultant damage in failing to follow the

contract specifications and instead installing nonconforming

HVAC units. We reject defendant's characterization of the trial

court's legal conclusions.

 Defendant focuses on one portion of the trial judge's

opinion, which mentions defendant's claim resulted from her

dissatisfaction with the performance of the HVAC subcontractor,

 12 A-0347-10T1
Berry. In the discussion, the judge commented that if the HVAC

did not work properly, "it would be the responsibility of Berry

or the manufacturer of the product; and not [plaintiff.]" This

comment related to the causation question; that is, whether the

mold resulted from the efficiency of the units. It was not the

basis of the court's conclusion regarding plaintiff's liability,

as defendant now suggests.

 "Disputes between contractors and owner[s] as to extra work

and changes on building or working contracts are as old as the

practice of contracting for such work and are a fertile cause of

litigation." Headley v. Cavileer, 82 N.J.L. 635, 637 (E & A

1912). The "fundamental difficulty" encountered in this field

of litigation is that "there is no statute requiring such

contracts . . . to be in writing[.]" Id. at 637-38. No matter

how "'solemn in form'" the original agreement, parties are free

to renounce or modify it in any way they see fit. Id. at 638

(quoting Cooper v. Hawley, 60 N.J.L. 560, 563 (E & A 1897)).

Therefore, a "writing requirement may be expressly or impliedly

waived by the clear conduct or agreement of the parties or their

duly authorized representatives." Home Owners Constr. Co. v.

Glen Rock, 34 N.J. 305, 316 (1961). See also Salvatore v.

Trace, 109 N.J. Super. 83, 103 (App. Div. 1969), aff'd, 55 N.J.

362 (1970) (observing that contracting parties can waive a

 13 A-0347-10T1
writing requirement through their conduct). These aged

pronouncements reflect little has changed over time and aptly

describe what occurred in this matter.

 The judge thoroughly detailed his findings regarding who

made the decision to alter the specified HVAC units once those

identified in the specifications were unavailable. In doing so,

he specifically rejected defendant's claims that the decision

was unilaterally made by plaintiff. Further, the trial judge

found defendant's suggestion that she was ignorant of the

problem was not believable and he credited the painstaking

testimony, supported by documentation, presented by plaintiff

and Berry. The court determined defendant knew of the problem

because plaintiff had discussed the "HVAC issues" with her on

"at least [six] occasions[,]" she selected the chosen unit and

authorized the change. Moreover, plaintiff delayed her decision

for almost a month, giving her ample opportunity to consult with

Shade or Steinman, the architect and engineer who drew the

original plans. Finally, the court found no evidence submitted

by defendant showing plaintiff breached the amended proposal

regarding the installation of the HVAC units.

 These findings by the trial judge, including the

credibility determinations leading to his conclusion plaintiff

had not breached the parties' agreement, are "supported by

 14 A-0347-10T1
adequate, substantial and credible evidence." Rova Farms,

supra, 65 N.J. at 483-84. The court's findings and conclusion

will not be disturbed.

 Defendant next maintains plaintiff breached the contract's

implied covenant of good workmanship by failing to adequately

protect the property from storm damage. Defendant asserts she

relied upon plaintiff's express expertise, but the means

employed by plaintiff to secure the motel from storm damage

after removing the roof were performed improperly and not in a

workmanlike manner. Defendant argues the court erred in

requiring her to pay plaintiff to correct the damage caused by

its breach and maintains she is entitled to recover judgment

against plaintiff on this issue. We find these arguments

unavailing.

 Absent an express guarantee of good workmanship, "the law

implies a covenant that the contract will be performed in a

reasonably good and workmanlike manner." Ramapo Brae Condo.

Ass'n, Inc. v. Bergen Cnty. Hous. Auth., 328 N.J. Super. 561,

576-77 (App. Div. 2000), aff'd, 167 N.J. 155 (2001); see also

McDonald v. Mianecki, 79 N.J. 275, 293 (1979).

 In the first count of her counterclaim, defendant includes

a claim of breach of contract. The bases stated for the breach

include: the work performed and materials used were not in

 15 A-0347-10T1
compliance with the plans and the work was not in compliance

with applicable construction codes and regulations. The court

found defendant's proofs on each of these issues was lacking and

denied relief, concluding defendant, not plaintiff breached the

contract.

 The third count of the counterclaim asserts "breach of UCC

warranties." The trial judge specifically found: "The Uniform

Commercial Code claim in the [t]hird [c]ount of the

[c]ounterclaim was not pursued at trial and deemed abandoned by

the [c]ourt. The [t]hird [c]ount is dismissed with prejudice."

 The fifth count of the counterclaim is the only claim

directed to plaintiff's alleged failure "to protect the interior

of the structure from [] exposure to the elements." The claim

asserts plaintiff was negligent. As to this issue, the trial

judge correctly noted defendant released plaintiff and his

subcontractor when she settled the matter with the insurance

carrier.

 The release is limited to the negligence claims in count

five of the counterclaim and specifically reserves all other

claims between plaintiff and defendant. The question is whether

a claim of breach of the implied covenant of good workmanship

was pled and proven. We find it was not.

 16 A-0347-10T1
 In support of this issue, defendant suggests plaintiff

could have proceeded by removing smaller sections of the roof at

any given time. Additionally, she notes the use of tarps, wood

and ropes did not allay the wind gusts of the storms and the

property was damaged. From these facts, defendant concludes

that because the tarps did not hold, plaintiff's workmanship was

improper.

 At trial, defendant's evidence regarding plaintiff's breach

of the contract was directed to its summer 2004 construction

stoppage and the alleged mold formulation from the flawed HVAC

installation. Defendant did not offer expert testimony opining

that the methods chosen to protect the property in the event of

a storm evinced a defect in workmanship (or merely was a result

of exceptional storm circumstances, as suggested by plaintiff).

In fact, there was no evidence offered to prove plaintiff's

workmanship in choosing the manner of roof removal, undertaking

piecemeal construction of the third-floor rooms and

weatherproofing the structure during construction, was improper.

 Defendant's final argument urges reversal of the trial

court's conclusion that she, not plaintiff, breached the

contract when she failed to release the twelfth draw payment.

Before the trial court, defendant argued plaintiff never asked

her for the twelfth draw. This contention was soundly rejected

 17 A-0347-10T1
by the trial judge, who found plaintiff's evidence credible. On

appeal, defendant now argues the completion of certain work,

which was not performed, was a precondition for the release of

the draw. Thus, her obligation to pay was not triggered. We

decline to consider this assertion, which was not raised before

the trial judge.

 It is well-settled we "decline to consider questions or

issues not properly presented to the trial court when an

opportunity for such a presentation is available 'unless the

questions so raised on appeal go to the jurisdiction of the

trial court or concern matters of great public interest.'"

Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)

(quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super.

542, 548 (App. Div. 1959), certif. denied, 31 N.J. 554 (1960)).

See also Spinks v. Twp. of Clinton, 402 N.J. Super. 465, 479

(App. Div. 2008), certif. denied, 197 N.J. 476 (2009).

 Affirmed.

 18 A-0347-10T1